# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

MICHAEL CONNELLEY, JOHN DOE GL-1, JOHN DOE GL-2, JOHN DOE GL-3, JOHN DOE GL-4, JOHN DOE GL-5, JOHN DOE GL-6, & JOHN DOE GL-7;

Case No.

Hon.

       Plaintiffs,

vs.

THE UNIVERSITY OF MICHIGAN & THE REGENTS OF THE UNIVERSITY OF MICHIGAN (in their individual and official capacities),

       Jointly and Severally,

       Defendants.

---

Manvir S. Grewal Sr. (P48082)
John W. Fraser (P79908)
Daniel V. Barnett (P82372)
**GREWAL LAW PLLC**
Attorneys for Plaintiffs
2290 Science Parkway
Okemos, MI 48864
Ph.: (517) 393-3000
Fax: (517) 393-3003
E: mgrewal@4grewal.com
E: jfraser@4grewal.com
E: dbarnett@4grewal.com

---

1

Stephen Drew (P24323)
Adam Sturdivant (P72285)
**DREW COOPER & ANDING**
Attorneys for Plaintiffs
80 Ottawa Ave NW, Ste. 200
Grand Rapids, MI 49503
Ph.: (616) 454-8300
E: sdrew@dca-lawyers.com
E: asturdivant@dca-lawyers.com

John C. Manly (admission forthcoming)
Vince Finaldi (admission forthcoming)
Alex E. Cunny (admission forthcoming)
**MANLY, STEWART & FINALDI**
Attorneys for Plaintiffs
19100 Von Karman Ave., Ste. 800
Irvine, CA 92612
Ph.: (949) 252-9990
E: jmanly@manlystewart.com
E: vfinaldi@manlystewart.com
E: acunny@manlystewart.com

Bartholomew J. Dalton (admission
forthcoming)
**DALTON & ASSOCIATES, P.A.**
Attorneys for Plaintiffs
1106 W. Tenth Street
Wilmington, DE 19806
Ph.: (302) 652-2050
E: BDalton@bdaltonlaw.com

---

## COMPLAINT AND JURY DEMAND

NOW COME Plaintiffs, by and through their attorneys, Grewal Law PLLC,

and for their Complaint against The University of Michigan ("UM") and the Regents

of the University of Michigan ("Regents"), collectively referred to as "Defendants,"

2

allege and state as follows:

## I.      <u>INTRODUCTION</u>

1.      While employed as a physician by UM from 1966 until 2003, Dr. Robert Anderson ("Anderson") used his position to sexually assault university students and others, many of whom were athletes.

2.      As early as 1968, or on information and belief even earlier, UM received complaints from male students about Anderson sexually assaulting them during putative medical examinations.

3.      In 1979, UM removed Anderson from his position as University Health Services ("UHS") Director after receiving repeated complaints that Anderson was sexually assaulting male students during medical examinations on campus.

4.      UM then moved Anderson to the position of full-time Athletic Department physician, and Anderson continued sexually assaulting male student athletes and others, many of whom were attending UM on athletic scholarships, or with grants-in-aid, or as members of various sports teams, including among others, football, wrestling, hockey, gymnastics, basketball, baseball, and track, until he retired in 2003.

5.      To UM, the Athletic Department became the perfect place to hide Anderson's past, present, and future sexual abuse of young men from public disclosure. The fact Anderson was given free reign to abuse hundreds – perhaps

thousands – of male athletes with impunity was, in the end, a calculated risk worth taking for the financial benefit and windfall that the Athletic Department conferred upon UM.

6.     This is a civil action against UM for declaratory, injunctive, equitable, and monetary relief for injuries sustained by Plaintiffs as a result of the acts, conduct, and omissions of Defendants in their official capacity, and their respective employees, representatives, and agents relating to sexual assault, abuse, molestation, and nonconsensual sexual touching and harassment by Anderson against Plaintiffs.

7.     Some of the Plaintiffs seek to proceed pseudonymously because of the extremely sensitive nature of the case as it involves sexual assault, and the suit will require disclosure of information of the utmost intimacy.[1]

## II.     JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 as this is a civil action arising from the Constitution, laws, and treaties of the United States, including but not limited to, Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, *et seq*., and the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983.

9.     This Court has original subject matter jurisdiction under 28 U.S.C. §

---

[1] Plaintiffs intend to pursue a stipulated protective order concerning their desire to proceed pseudonymously. In the event a stipulated protective order cannot be agreed upon, Plaintiffs intend to proceed with filing a motion for such a protective order.

4

1343 as this is a civil action authorized by law brought by a person to redress the deprivation, under color of a State law, statute, ordinance, regulation, custom, or usage of a right, privilege, or immunity secured by the Constitution of the United States or by an Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States, and a civil action to recover damages or to secure equitable relief under an Act of Congress providing for the protection of civil rights.

10.     This Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a) to hear and decide claims arising under state law that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

11.     The claims are cognizable under the United States Constitution, 42 U.S.C. § 1983, 20 U.S.C. § 1681 *et seq*., and under Michigan Law.

12.     The amount in controversy exceeds the jurisdictional minimum of $75,000.00.

13.     The events giving rise to this lawsuit occurred in Washtenaw County, Michigan which sits in the Southern Division of the Eastern District of Michigan.

14.     Venue is proper in the United States District Court for the Eastern District of Michigan, pursuant to 28 U.S.C. § 1391(b)(2), in that this is the judicial district in which the events giving rise to the claims occurred.

5

15.     Plaintiffs' Complaint is timely filed within the applicable statutes of limitations and under M.C.L. § 600.6431(3) and MCL 600.5855.

## III.   PARTIES

16.     Plaintiff Michael Connelley is a resident of the State of Michigan.

17.     Plaintiff John Doe GL-1 is a resident of the State of Michigan.

18.     Plaintiff John Doe GL-2 is a resident of the State of Michigan.

19.     Plaintiff John Doe GL-3 is a resident of the State of Michigan.

20.     Plaintiff John Doe GL-4 is a resident of the State of Michigan.

21.     Plaintiff John Doe GL-5 is a resident of the State of Michigan.

22.     Plaintiff John Doe GL-6 is a resident of the United States and resides outside the State of Michigan.

23.     Plaintiff John Doe GL-7 is a resident of the United States and resides outside the State of Michigan.

24.     UM is a public university organized and existing under the laws of the State of Michigan.

25.     UM receives federal financial assistance and is therefore subject to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).

26.     The Regents of the University of Michigan is a body corporate, with the right to be sued, vested with the government of the university. M.C.L. § 390.3 and 390.4.

6

27.     Defendants are not immune from suit under the Governmental Tort Liability Act, M.C.L. § 691.1401, *et seq*., sovereign immunity, or any other statute or Michigan or United States constitutional provision.

## IV.  **COMMON FACTUAL ALLEGATIONS**

28.     Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

29.     From the early 1960s until 2003, Anderson was a physician employed by UM treating students on UM's Ann Arbor campus, during which time UM gave Anderson unfettered access to young college students, including, without limitation, young male athletes.

30.     UM appointed Anderson on or about September 1, 1966 as the Clinical Instructor in Internal Medicine and Clinical Instructor in Surgery, Medical School and the Senior Physician of UHS.

31.     It was sometime soon after beginning employment with UM that, according to Ambassador Ron Weiser, the current chair of UM Regents, Dr. Anderson abused Ambassador Weiser while Weiser was a freshman wrestler at UM.

32.     On or about October 1, 1968, UM promoted Anderson to UHS Director, and Anderson continued as the Athletic Department's primary care physician and team physician for many of UM's athletic teams.

33.     In 1968 or 1969, a gay UM student, (whose true name will be protected

7

due to the highly sensitive information ("Student A")), went for an examination by Anderson, an examination that Student A later described to the Detroit News as "very traumatic."

34.     Student A states "he (Anderson) had me drop my pants, he felt my penis and genitals, and subsequently, he (Anderson) wanted me to feel his (Anderson's) penis and genitals."

35.     Student A further states, "Back then you did not question a doctor's authority…He asked me to pull on his penis."

36.     Student A filed a written complaint with UM health service and filled out a form, complaining that Anderson had dropped his pants and asked him to fondle his genitals during the exam.

37.     No one from UHS or any other UM agency followed up with Student A or contacted him as part of an investigation into Student A's written sexual assault complaint.

38.     On information and belief, UM never acted on and/or investigated Student A's complaint against Anderson.

33.     In 1969, former University of Oklahoma and Washington State gymnastics coach (whose true name will be protected due to the highly sensitive information ("Coach A")) saw Dr. Anderson for a physical examination for the first time as a freshman scholarship gymnast at UM.

34.     During this 1969 physical, Dr. Anderson digitally penetrated Coach A's anus.

35.     Afterward Coach A tried to express his concern about this act to his UM gymnastics coach, Newt Loken, by stating to Coach Loken words to the effect of "what was up with Dr. A?"  In response, Coach Loken patted Coach A on the knee, smiled a "wry Cheshire grin," and changed the subject.

36.     Based on that reaction, Coach A "knew he (Coach Loken) knew. We all knew he knew" and did not complain again.

37.     At that time, Coach Loken was an agent of both the Athletic Department and UM.

38.     Coach Loken continued to coach the gymnastics team until 1983 and remained affiliated with the gymnastics program and Athletic Department until at least 2007.

39.     In 1973, Anderson fondled the genitals of another undergraduate man to the point of ejaculation. The complainant reported this incident in 1994 to the predecessor of Michigan's Department of Licensing and Regulatory Affairs (LARA).

40.     On information and belief, in the ordinary course of a reported sexual assault by a regulated professional, LARA would have contacted UM as Anderson's employer. Yet, UM continued to employ Anderson until his voluntary retirement in

9

2003.

41.     In 1975, UM's head wrestling coach, Bill Johannesen, admitted that whenever one of his wrestlers went to Anderson they had to "drop their drawers" even if the injury was to the wrestler's elbow.

42.     In 1975, UM student and scholarship member of UM's wrestling team, (whose true name will be protected due to the highly sensitive information ("Student B")), gave notice of Anderson's sexual misconduct in a 10-page letter to Coach Johannesen, complaining, among other things, that "[s]omething was wrong with Anderson, regardless of what you are there for, he *insists* that you 'drop your drawers and cough" (emphasis added).

43.     Neither UM, Coach Johannesen, nor any agents of UM investigated Student B's complaints about Anderson's sexual assaults; instead, Coach Johannesen took away Student B's athletic scholarship and kicked him off the wrestling team.

44.     Student B appealed to then-Athletic Director Don Canham and provided him with a copy of the letter sent to Coach Johannesen, giving Director Canham notice of the allegations against Anderson.

45.     Director Canham did not investigate the sexual abuse complaints against Anderson, and instead, upheld the revocation of Student B's athletic scholarship.

10

46.     Student B had to hire an attorney and appeal to UM's Board of Intercollegiate Athletics to have his scholarship reinstated.

47.     Plaintiff John Doe MC-16, who filed a similar complaint against UM in Case 2:20-cv-10622-VAR-EAS in the United States District Court for the Eastern District of Michigan on March 8, 2020, attended UM in the 1970s on a track athletic scholarship.

48.     Anderson repeatedly groped John Doe MC-16's penis and testicles (and digitally penetrated his anus once) during approximately 25 visits to Anderson for a variety of illnesses and injuries.

49.     After one of those visits in 1976, John Doe MC-16 approached both his head coach, Jack Harvey, and assistant coach, Ron Warhurst, and told them that Anderson was touching and groping his penis and testicles during Anderson's "medical examinations."

50.     Anderson had already digitally penetrated John Doe MC-16's anus at the time John Doe MC-16 told coaches Harvey and Warhurst about the genital groping, but John Doe MC-16 was too embarrassed to tell his coaches about the penetration.

51.     After reporting Anderson's "odd" or "weird" conduct to Coach Harvey and Coach Warhurst, John Doe MC-16 further asked to go to another physician so he could get medical assistance for his injuries.

52.     Both Coach Harvey and Coach Warhurst laughed at John Doe MC-16's complaint and refused to send him to a different physician.

53.     It was this type of indifference and acceptance and promotion of Anderson's acts by coaches that normalized Anderson's acts as required medical acts or treatment for all athletes across all teams as just part of participating in UM athletics.

54.     Defendants' indifference and acceptance of Anderson's sexual abuse of students and patients is further supported by Athletic Director Canham's indifference to Student B's complaint about Dr. Anderson, which normalized and enshrined Anderson's acts as simply "department policy" or protocol for the medical treatment of all athletes.

55.     During this same period in the mid-1970s, numerous track athletes called Anderson "pants down doctor."

56.     According to records of the Washtenaw County Prosecutor's Office, in 1979, a then-graduate student at UM was seen by Anderson at the UHS when Anderson "gave undue attention to my genitals and rectal area. It was very physically and socially uncomfortable…he inserted his finger into my rectum for a period that was longer than any other hernia or rectal evaluation."

57.     This graduate student complained loudly to the desk clerk, and then an administrator, both of whom "dismissed" him and ordered a security guard to escort

him out of UHS, instead of investigating his allegation against Anderson.

58.     In the Fall of 1979, John Doe MC-73, *Doe-MC 73 v The University of Michigan et al*, EDMI Case No. 4:20-cv-11702-VAR-EAS, a then junior-year, gay student at UM became aware of a Monday night afterhours program sponsored by the UHS where UHS personnel treated sexual minorities in a confidential setting.

59.     John Doe MC- 73 went to one of these Monday night program sessions, filled out paperwork, including a health history form identifying himself as gay, and was seen by Anderson.

60.     In the exam room, Anderson told John Doe MC-73 to drop or lower his pants (and underwear) and initially did what seemed like a sports physical on John Doe MC-73's penis.

61.     However, after this initial sports-like physical exam, Anderson moved in closer to the standing John Doe MC-73, who still had his pants down.

62.     Standing face-to-face with John Doe-MC 73, Anderson then stated: "It is a shame that you are circumcised.  It feels really good when I (Anderson) am masturbating to have the foreskin (on his uncircumcised penis) rub against the head of my (Anderson) penis."

63.     John Doe MC-73 realized that Anderson was "playing with himself" as he described his masturbatory habits to John Doe MC-73 and Anderson's "breathing became heavy".

64.     Still stunned and intimidated by this authority figure doing such an act during a confidential medical exam, John Doe MC-73 did not move while Anderson continued.

65.     Soon after this exam by Anderson, John Doe MC-73 mentioned the assault at the after-hours clinic to a gay student he knew.  This student stated, "It sounds like you saw Dr. Anderson.  Everyone knows about him.  He always cops a feel."

66.     John Doe MC-73 was shocked and outraged by Anderson's assault. John Doe MC-73 became especially concerned and worried for other gay young men who might treat in the future with Anderson and who may be emotionally vulnerable (as John Doe-MC 73 had himself been in some months before) such that a similar act by Anderson on those individuals may lead some to suffer further emotional turmoil or self-harm.

67.     This shock over Anderson's assault and worries about other struggling gay students led John Doe MC-73 to report Anderson's abuse to UM-paid gay male advocate ("Advocate") who served as the coordinator of UM's Human Sexuality Office.

68.     The Advocate told John Doe MC-73 that his experience was "very similar" to a prior  complaint about Anderson sexually assaulting a gay male student at UHS, but that UM ended up doing nothing because it viewed it as a "he said, he

14

said" situation when Anderson denied the prior assault.

69.     John Doe MC-73 filed a formal complaint with Thomas Easthope, the Vice President of Student Life Services, who John Doe MC-73 understood to be Anderson's supervisor.

70.     After the complaint was filed, the Advocate accompanied John Doe-MC 73 to a scheduled meeting at Easthope's office in UM's Administration Building.

71.     After hearing John Doe MC-73's retelling of Anderson's assault, Vice President Easthope told John Doe-MC 73 and the Advocate that Easthope "was very sorry" and that he "needed to do an investigation and I will get back to you."

72.     Easthope met with John Doe MC-73 and the Advocate approximately one week later.   At this second meeting Easthope told John Doe MC-73, "He (Anderson) does not deny your allegations against him" and that Anderson had asked Easthope "to deliver an apology from Dr. Anderson."

73.     Easthope told John Doe MC-73 "Dr. Anderson is troubled, sick, and needing help…he's very sorry for any distress or upset he caused you."

74.     Easthope continued with words to the effect of, "My first thought was to fire him.  But he has a family and kids."  Easthope then stated words to the effect that if Anderson were fired then both he and his family would suffer financially.

75.     Easthope then offered the following proposal to resolve John Doe MC-

15

73's claim: "Would it be okay with you if Anderson is removed from his medical duties and moved to an administrative position where the University would keep him away from other students?"  Easthope further offered that Anderson "would not be able to treat patients in the University setting."

76.    From the context of Easthope's words, it was clear to John Doe-MC 73 that Easthope wanted John Doe MC-73 to not publicly complain or seek any kind of claim against Anderson or UM if Easthope would ensure that Anderson would not be able to treat any more patients while Anderson was at UM.

77.    John Doe MC-73 verbally agreed to Easthope's proposal, and Easthope sealed the deal when he and John Doe MC-73 "shook hands on that (agreement)." Easthope told John Doe MC-73, "Thank you for having the guts to come forward."

78.    John Doe MC-73 never thought to follow up on his agreement with Easthope because, in John Doe MC-73's mind, Easthope was a high ranking UM official and there was no reason to distrust someone like that, especially at UM, the university that John Doe MC-73 has loved for decades.

79.    Instead of moving Anderson to an administrative position where Anderson could not treat any more students, as promised to John Doe-MC 73, Easthope and other high ranking executives at UM merely moved Anderson from UHS and put him in a position where he could, once again, treat and abuse young male students as the first paid, full-time Athletic Department physician.

16

80.     According to longtime UM athletic trainer Russell Miller, Athletic Director Don Canham—a legendary and powerful figure at UM—"worked out a deal" to bring Anderson over to the Athletic Department.

81.     Dr. Anderson himself told the Ann Arbor News that Canham created a brand-new position for him as the "formal team physician" in 1980.   See the Ann Arbor News, June 10, 1999, p. B7.

82.     Protected by UM executives, Anderson used this new paid position to abuse hundreds of UM male athletes.

83.     When questioned in 2018, Easthope told Detective West of UM Division of Public Safety and Security a different account of John Doe MC-73's complaint and left out his agreement with John Doe-MC 73.

84.     Instead, he told Detective West that a UM Student Life employee and local UM activist (presumably the Advocate) told Easthope that Anderson had assaulted several members of the gay community at UM.

85.     Easthope, who as Vice President of Student Life had supervisory oversight of the UHS, minimized Anderson's sexual abuse by depicting Anderson's actions as "fooling around with boys in the exam room."

86.     Indeed, the same gay UM Student Life employee who made the report to Easthope had personal knowledge of Anderson's abuse: when that Student Life employee was examined by Anderson during a routine physical, Anderson stuck his

finger in the Student Life employee's anus, and when the employee jumped from pain and discomfort, Anderson stated, "I thought that you would have enjoyed that!"

87.     Detective West's report of that Easthope interview does not record any mention by Easthope of John Doe-MC 73 or the agreement Easthope made with John Doe MC-73.

88.     As told by Easthope to Detective West, Easthope says he decided to terminate Anderson but was nervous because Anderson was a "big shot" at UM.

89.     Easthope reported to West that he confronted Anderson about knowing Anderson abused several people that were in the gay community and that he was "fooling around in the exam rooms" with male students and Anderson "did not deny" Easthope's accusations.

90.     According to Easthope, Easthope told Anderson, "You gotta go."

91.     Easthope then told West that after initially firing Anderson, Easthope stated he decided to allow Anderson to resign to avoid an employee termination fight which would delay Anderson's leaving his job, and presumably, UM.

92.     During this time, Easthope was an employee, agent, or representative of UM.

93.     According to Det. West, Easthope claimed he thought Anderson left campus in 1980, even though Anderson was a prominent part of the nationally known Michigan football team for the next two decades.

94.     Even if Easthope's account to Det. West is true, neither Easthope nor his superiors or subordinates followed up to ensure that Anderson left UM after his severance from UHS.

95.     When Easthope was recently confronted about Anderson, Easthope estimated "I bet there are over 100 people that could be on that list (of young men abused by Anderson)."

96.     According to UM human resource records, instead of terminating Anderson, UM "demoted" Anderson effective January 14, 1980 and moved him to the Athletic Department to be the primary care physician.

97.     Dana Mills, the then-Administrative Manager at the UHS, said the "V.P.'s Office" would have been responsible for Anderson's transfer to the Athletic Department.

98.     Anderson was highly regarded as a university physician, especially by leaders in the Athletic Department, including a longtime UM athletic trainer who called Anderson an "unbelievable team doctor;" another UM athletic trainer who called Anderson "very incredible;" and one longtime coach of UM football coaching staff during the 1980s, 1990s, and 2000s who called Anderson "a tremendous asset."

99.     Indeed, UM went so far as to overtly and fraudulently conceal Anderson's predatory sexual conduct against primarily college age males and intentionally conceal the reason for Anderson's termination/demotion, by praising

19

Anderson in the published Acknowledgement preface of Volume III of the President's Report of THE UNIVERSITY OF MICHIGAN for 1979-1980.

100.   UM misrepresented, lied and promoted false information, in this publication by telling the public: "The University Health Service staff wish to acknowledge the 11 years of leadership provided by Robert E. Anderson, M.D. In January of 1980, Anderson resigned as Director of the University Health Service to devote more time to his clinical field of urology/andrology and athletic medicine…his many contributions to health care are acknowledged…The University Health Service staff wish to thank Anderson for his years of leadership and to dedicate the Annual Report to him."

101.   UM misrepresented, lied and promoted false information, when it described Anderson's departure as voluntary and lauded his "leadership" when UM and its executives knew that: (a) Easthope fired or transferred Anderson for his sexual assaults on male students; and (b) Anderson's termination  or transfer was changed to a written demotion in his human resources file, through the efforts of Athletic Director Canham and other "V.P.s," so Anderson could go to the Athletic Department and continue sexually abusing UM students, athletes, and patients under the guise of medical treatment.

102.   After UM "demoted" the "big shot" Anderson to work full-time at the Athletic Department, Anderson had access to hundreds of male scholarship athletes

(as well as non-scholarship male athletes and others)—many from middle or working class families who could not afford to attend UM without an athletic scholarship—and were trained to unquestioningly endure physical and emotional discomfort without complaining in order to compete in their sport.

103. The demotion gave Anderson free reign to abuse hundreds of male athletes, such as Plaintiffs, with impunity.

104. After his demotion for sexually abusing students on campus, Anderson was held up and regarded as "the" medical authority of the athletic department, including the football team, for decades by authority figures of UM athletic department, including its athletic director, Don Canham.

105. John Doe MC-27, who filed a similar complaint against UM in Case 2:20-cv-10785-VAR-EAS in the United States District Court for the Eastern District of Michigan on March 26, 2020, attended UM in the 1980s and 1990s on athletic scholarship for football.

106. During John Doe MC-27's first physical examination by Dr. Anderson, Anderson groped, fondled, and cupped John Doe MC-27's penis and testicles for an excessively long time while Anderson's face was within inches of John Doe MC-27's penis and testicles.

107. John Doe MC-27 encountered longtime UM trainer Paul Schmidt and other trainers as he (John Doe MC-27) exited this initial, inappropriate freshman

football physical examination by Anderson.

108.   Seeing that John Doe MC-27 was exiting his examination by Dr. Anderson, trainer Paul Schmidt laughed and told John Doe MC-27 "get used to that"—referring to Anderson's sexual abuse.

109.   The other trainers laughed as well, and it was clear to John Doe MC-27 that Schmidt and the other trainers knew what Dr. Anderson was doing in the exam room to athletes.

110.   It was this type of indifference and acceptance of Anderson's acts by trainers that also normalized Anderson's acts as required medical acts or treatment for all athletes across all teams as just part of participating in UM athletics.

111.   Mr. Schmidt is still employed by UM and, on information and belief, is currently the Assistant Athletic Director for the Athletic Department.

112.   It is indicative of Dr. Anderson's power and influence at UM that UM adopted mandatory student-athlete physicals only after Anderson recommended this mandate, which gave Anderson increased access to male student-athletes to abuse.

113.   Dr. Anderson's power and influence at UM was illustrated by the fact that Anderson travelled with UM's vaunted football team, stayed in the football team's hotel as part of the Athletic Department's traveling party, was included in every football team end-of-year bowl VIP traveling entourage, and was a fixture on the sidelines during UM's nationally televised football games.

22

114.   Archived records at UM's Bentley Library describe Dr. Anderson's influence within the Athletic Department as such that he was able to quash a proposal to allow the athletes more latitude in choosing treatment by doctors other than Anderson.

115.   Anderson remained in a position of power and authority within the Athletic Department even though written exit evaluations by graduating senior athletes routinely gave Anderson poor grades for his treatment of the student-athletes that he was preying on and sexually abusing.

116.   Anderson treated UM athletes for every medical ailment, complaint, and injury as their UM-assigned internist. He served as their first medical point of contact no matter the injury or ailment at issue, including everything from a cold to the flu to broken bones.

117.   During his employment, agency, and representations with UM, Anderson sexually assaulted, abused, and molested male student athletes and others by engaging in nonconsensual sexual touching, assault, and harassment, including, but not limited to, medically unnecessary genital manipulation and digital anal penetration.

118.   Because UM took no action to investigate the complaints from students that began as early as 1968, or earlier, and took no corrective actions even after Easthope attempted to fire Anderson in 1979, students, student-athletes, and patients

were sexually assaulted, abused, and molested by Anderson through, without limitation, nonconsensual digital anal penetration and nonconsensual sexual touching of genitals.

119.   The students and others that Anderson abused did not understand (as UM did) the nature of the treatment Anderson administered, or rather that his putatively "necessary medical treatment" was not done to heal them but rather to satisfy Anderson's sexual desires.

120.   In particular, because so many were victimized, student athletes and others "normalized" Anderson's abuse and accepted it as normal medical treatment that they had to endure as an athlete already under intense, grueling training and physical demands, and they did not know that they were victims of assault at the time it occurred.

121.   Although uncomfortable with the treatments, the student athletes and others were led to believe by those in authority, including Athletic Director Canham, coaches, trainers, and Anderson, that the treatments were medically necessary or helpful.

122.   On July 18, 2018, UM alumnus, Student B, sent a letter to Warde Manuel, UM Athletic Director, notifying Manuel—as he did Don Canham in 1975— of Anderson's sexual assault while Student B was a student between 1972 to 1976.

123.   On information and belief, UM then requested UM police department

to open a non-public investigation, but UM did not take further action to notify former students and/or the public about the allegations and/or investigation until 19 months later.

124.   As UM President Schlissel admitted on February 20, 2020, "[o]ur (UM) police found indications that U-M staff members were aware of rumors and allegations of misconduct during Anderson's medical exams."

125.   As stated above, at least one of the Regents has personal knowledge that the complaints received on July 18, 2018, were and are true:  Ron Weiser, chairman of the Regents.

126.   Another member of the Regents, Regent Paul Brown, recently publicly stated that three members of his family who were student-athletes at UM were also sexually abused by Dr. Anderson.

127.   Nonetheless, neither UM nor the Regents took any steps to notify the public or its alumni about Anderson's abuse until compelled to do so by the press in February 2020.

128.   UM and the Regents' 19-month delay in notifying the public and alumni about Anderson's abuse of student-athletes is consistent with the pattern of UM's recent reactions to sexual abuse allegations: for several years, Defendants have been under intense media, public, and government scrutiny regarding their mishandling of sexual harassment and sexual assault by faculty members, including,

but not limited to by Professor David Daniels; several Title IX complaints by students in recent years; and complaints of sexual misconduct and inappropriate behavior against Provost Martin Philbert.

129.    At all relevant times, Anderson maintained an office at UM in Ann Arbor, Michigan.

130.    At all relevant times, Defendants were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or UM.

131.    At all relevant times, Warde Manuel, Don Canham, Paul Schmidt, and others listed herein were acting within the course and scope of their employment or agency with UM.

132.    At all relevant times, including the years 1966 to 2003, Anderson was acting within the course and scope of his employment or agency with UM.

## V.     PLAINTIFF'S SPECIFIC FACTUAL ALLEGATIONS

### A.     Michael Connelley

132.    Plaintiffs reallege and incorporate by reference the allegations in the previous and subsequent paragraphs.

133.    Plaintiff Michael Connelley ("Plaintiff Connelley") is a 56-year-old man who resides in Michigan.

134.    Plaintiff Connelley had at least 10 appointments with Anderson

between approximately 1982 and 1985, when Plaintiff Connelley was 17 to 20 or 21 years old.

135.   Plaintiff Connelley was seen by Anderson at Anderson's clinic in the Michigan Professional Building on Clark Road.  Upon information and belief, the address is 3145 W. Clark Road, Ypsilanti, MI 48197.

136.   Plaintiff Connelley was sexually abused and negligently given valium prescriptions by Anderson for about three years in the early to mid-1980s.

137.   At all visits, Plaintiff Connelley was seen in Anderson's office. Plaintiff Connelley had at least 10 visits with Anderson, and was abused at every visit, including the first.

138.   Plaintiff Connelley experienced fondling of his penis and testicles at the first visit, which continued in every visit thereafter.  At later visits, Plaintiff Connelley also experienced anal penetration, in addition to penis/testicle fondling.

139.   Anderson never used gloves or washed his hands.  At the last few visits, Anderson also instructed Plaintiff Connelley to fondle Anderson's penis.

140.   Valium overprescribing occurred at second office visit and occurred at all subsequent visits.

141.   At the first visit, Anderson pulled Plaintiff Connelley's pants down and started to "pull" on Plaintiff Connelley's penis.  There was no explanation of why Plaintiff Connelley's pants were pulled down – or even any warning.

27

142.    Anderson started fondling Plaintiff Connelley's penis and then pulled Plaintiff Connelley's pants back up.

143.    When Plaintiff Connelley asked about his own sore throat, Anderson said, "I will prescribe you an antibiotic."  Anderson did not examine Plaintiff Connelley's throat, take vital signs, or ask Plaintiff Connelley what his signs and symptoms were.  This first visit lasted approximately 20 – 25 minutes.

144.    Approximately one month after the first visit, Plaintiff Connelley was seen by Anderson for acute anxiety.  At this visit, Anderson gave Plaintiff Connelley valium, 10 mg.   This visit began a cycle of valium dependency for Plaintiff Connelley.

145.    At every visit, Plaintiff Connelley would experience the same abuse. Plaintiff Connelley would go into the office, whereupon Anderson would immediately pull down Plaintiff Connelley's pants and start molesting Plaintiff Connelley.

146.  Valium was given at the second visit and at all subsequent visits.   Plaintiff Connelley was sent home with a huge bottle of valium.

147.    Anderson had Plaintiff Connelley turn on his side on the table, whereupon Anderson would proceed to penetrate Plaintiff Connelley's anus with his middle finger.  Plaintiff Connelley was a virgin at the time of this sexual assault.

148.   After Anderson penetrated Plaintiff Connelley's anus without gloves, Anderson had Plaintiff Connelley roll over and Anderson roughly started pulling on Plaintiff Connelley's penis and playing with his testicles.

149.   Plaintiff Connelley was experiencing the effects of valium while being molested.

150.   Anderson did not use lubrication while penetrating Plaintiff Connelley's anus.

151.   On at least one occasion, Anderson made Plaintiff Connelley fondle Anderson's penis.

152.   At the time, due to representations made by Anderson and others at UM, Plaintiff Connelley reasonably believed Anderson's conduct was medical care, treatment, and examination necessary for his health and participation in athletics.

153.   Plaintiff Connelley did not discover that Anderson's conduct was not legitimate medical care, but instead intended for Anderson's own sexual gratification, until February 2020, when various news reports revealed that multiple other survivors had experienced similar abuse and assaults.  Plaintiff Connelley did not consent to any touching for Anderson's sexual gratification.

154.   Any implied or express consent was obtained by fraud and duress under the guise of medical treatment and examination.

155.   These repeated incidents of sexual assault and battery have embarrassed and humiliated Plaintiff Connelley, resulting in severe emotional distress affecting his day-to-day life. The emotional distress and damage caused by these events exists today and will likely last for the rest of his life. As the direct and proximate result of Anderson and Defendants' actions and/or inactions stated above, Plaintiff Connelley has suffered discomfort and continues to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, PTSD with physical manifestations, anxiety, depression, sadness, loss of self-esteem, disgrace, fright, grief, humiliation, and loss of enjoyment of life, was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earnings and earning capacity, as well as past, present, and future medical expenses.  Plaintiff became addicted to valium and benzodiazepines.

### B.    John Doe GL-1

156.   Plaintiffs reallege and incorporate by reference the allegations in the previous and subsequent paragraphs.

157.   Plaintiff John Doe GL-1 is a 48-year-old man who resides in Michigan.

158.   Plaintiff John Doe GL-1 was seen by Anderson on two occasions in or about 2000 or 2001.

159.   Upon information and belief, Plaintiff John Doe GL-1 was seen by

Anderson at the East Ann Arbor Health Center on the campus of University of Michigan. Upon information and belief, the address of that office is 4260 Plymouth Rd., Ann Arbor, MI 48109.

160. In or about 2000 or 2001, Plaintiff John Doe GL-1 was experiencing severe headaches.

161. At the time, Plaintiff John Doe GL-1 did not have a primary care physician and came to establish care with Anderson.

162. Anderson ordered an MRI examination for Plaintiff John Doe GL-1.

163. After the MRI exam, Plaintiff John Doe GL-1 was seen by Anderson in follow up.

164. At this follow up visit, Anderson told Plaintiff John Doe GL-1 that Plaintiff John Doe GL-1 had a tumor that could cause developmental delays, so Anderson needed to conduct a thorough physical examination of Plaintiff John Doe GL-1.

165. Anderson directed Plaintiff John Doe GL-1 to disrobe to his socks and to lay on an examination table.

166. Starting at Plaintiff John Doe GL-1's feet, Anderson touched every part of Plaintiff John Doe GL-1's body.

167.   Upon reaching Plaintiff John Doe GL-1's genitals, Anderson grabbed Plaintiff John Doe GL-1's penis with both hands and, breathing heavily, examined and manipulated Plaintiff John Doe GL-1's penis.

168.   Upon information and belief, the medical records indicate Plaintiff John Doe GL-1 was given a prostate exam, although Plaintiff John Doe GL-1 does not recall that exam being performed.

169.   At the time, due to representations made by Anderson and others at UM, Plaintiff John Doe GL-1 reasonably believed Anderson's conduct was medical care, treatment, and examination necessary for his health and participation in athletics.

170.   Plaintiff John Doe GL-1 did not discover that Anderson's conduct was not legitimate medical care but instead intended for Anderson's own sexual gratification until approximately February 2020, when various news reports revealed that multiple other survivors had experienced similar abuse and assaults.

171.   Plaintiff John Doe GL-1 did not consent to any touching for Anderson's sexual gratification.

172.   Any implied or express consent was obtained by fraud and duress under the guise of medical treatment and examination.

173.   These incident of sexual assault and battery have embarrassed and humiliated Plaintiff John Doe GL-1, resulting in severe emotional distress affecting

his day-to-day life. The emotional distress and damage caused by these events exists today and will likely last for the rest of his life. As the direct and proximate result of Anderson and Defendants' actions and/or inactions stated above, Plaintiff John Doe GL-1 has suffered discomfort and continues to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, PTSD with physical manifestations, anxiety, depression, sadness, loss of self-esteem, disgrace, fright, grief, humiliation, and loss of enjoyment of life, lack of trust or inability to trust others, was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earnings and earning capacity, as well as past, present, and future medical expenses.

174.   Plaintiff John Doe GL-1 has filed a notice of intention to file a claim against Defendants in the Michigan Court of Claims under the pseudonym "John B6 Doe."

**C.    John Doe GL-2**

175.   Plaintiffs reallege and incorporate by reference the allegations in the previous and subsequent paragraphs.

176.   Plaintiff John Doe GL-2 is a 64-year-old man who resides in Michigan.

177.   Plaintiff John Doe GL-2 was seen by Anderson on several (approximately 8-10) occasions between about 1974 and 1979.

33

178.   Upon information and belief, Plaintiff John Doe GL-2 was seen by Anderson at Anderson's office at 3145 Clark Road, Ypsilanti, MI 48197.  Plaintiff John Doe GL-2 was also seen by Anderson at Schembechler Hall in the course of participating as a student-athlete on the University of Michigan varsity football team. Upon information and belief, the address of Schembechler Hall is 1200 S State Street, Ann Arbor, MI 48109.

179.   Between about 1974 and about 1979, Plaintiff John Doe GL-2 was a student-athlete on the University of Michigan football team and physical examinations with Anderson were required.

180.   On each occasion, Anderson instructed Plaintiff John Doe GL-2 to strip down.

181.   On at least one occasion, Plaintiff John Doe GL-2 was being seen for a hamstring injury and Anderson digitally penetrated Plaintiff John Doe GL-2's anus while Plaintiff John Doe GL-2 was lying face down on the examination table.

182.   On another occasion, Plaintiff John Doe GL-2 was seen for a dislocated elbow when Anderson groped and fondled Plaintiff John Doe GL-2's genitalia.

183.   At the time, due to representations made by Anderson and others at UM, Plaintiff John Doe GL-2 reasonably believed Anderson's conduct was medical care, treatment, and examination necessary to remain on the football team.

184.   Plaintiff John Doe GL-2 did not discover that Anderson's conduct was not legitimate medical care, but instead intended for Anderson's own sexual gratification, until February 2020, when various news reports revealed that multiple other survivors had experienced similar abuse and assaults.

185.   Plaintiff John Doe GL-2 did not consent to any touching for Anderson's sexual gratification.  Any implied or express consent was obtained by fraud and duress under the guise of medical treatment and examination.

186.   These incidents of sexual assault and battery have embarrassed and humiliated Plaintiff John Doe GL-2, resulting in severe emotional distress affecting his day-to-day life. The emotional distress and damage caused by these events exists today and will likely last for the rest of his life. As the direct and proximate result of Anderson and Defendants' actions and/or inactions stated above, Plaintiff John Doe GL-2  has suffered discomfort and continues to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, PTSD with physical manifestations, anxiety, depression, sadness, loss of self-esteem, disgrace, fright, grief, humiliation, and loss of enjoyment of life, lack of trust or inability to trust others, was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earnings and earning capacity, as well as past,

present, and future medical expenses.  Plaintiff John Doe GL-2's has also been deprived of the society, companionship, and intimate relationship of his spouse.

187.   Plaintiff John Doe GL-2 has filed a notice of intention to file a claim against Defendants in the Michigan Court of Claims under the pseudonym "John B14 Doe."

**D.**     **John Doe GL-3**

188.   Plaintiffs reallege and incorporate by reference the allegations in the previous and subsequent paragraphs.

189.   Plaintiff John Doe GL-3 is a 76-year old man who resides in Michigan.

190.   Plaintiff John Doe GL-3 was seen by Anderson on at least one occasion between about 1980 and 1982.

191.   Upon information and belief, Plaintiff John Doe GL-3 was seen by Anderson at UM of Michigan University Health Service student health center on central campus.  Upon information and belief, the address of that location is 207 Fletcher Street, Ann Arbor, Michigan, 48109.

192.   On at least one occasion between 1980 and 1982, Plaintiff John Doe GL-3 sought medical attention for a respiratory illness.

193.   Plaintiff John Doe GL-3 was seen by Anderson in a large examination room.  Plaintiff John Doe GL-3 and Anderson were the only two people in the room.

194.   Anderson directed Plaintiff John Doe GL-3 to remove his clothes. When Plaintiff John Doe GL-3 asked, "all of them?" Anderson stated, "yes."

195.   Anderson walked around Plaintiff John Doe GL-3, checked Plaintiff John Doe GL-3's eyes and ears, and then grasped Plaintiff John Doe GL-3's penis for a period of several seconds.

196.   At the time, due to representations made by Anderson and others at UM, Plaintiff John Doe GL-3 reasonably believed Anderson's conduct was medical care, treatment, and examination necessary to address his health issues.

197.   Plaintiff John Doe GL-3 did not discover that Anderson's conduct was not legitimate medical care, but instead intended for Anderson's own sexual gratification, until February 2020, when various news reports revealed that multiple other survivors had experienced similar abuse and assaults.

198.   Plaintiff John Doe GL-3 did not consent to any touching for Anderson's sexual gratification.  Any implied or express consent was obtained by fraud and duress under the guise of medical treatment and examination.

199.   This incident of sexual assault and battery have embarrassed and humiliated Plaintiff John Doe GL-3, resulting in severe emotional distress affecting his day-to-day life. The emotional distress and damage caused by these events exists today and will likely last for the rest of his life. As the direct and proximate result of Anderson and Defendants' actions and/or inactions stated above, Plaintiff John Doe

GL-3 has suffered discomfort and continues to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, PTSD with physical manifestations, anxiety, depression, sadness, loss of self-esteem, disgrace, fright, grief, humiliation, and loss of enjoyment of life, lack of trust or inability to trust others, was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earnings and earning capacity, as well as past, present, and future medical expenses.

200.   Plaintiff John Doe GL-3 has filed a notice of intention to file a claim against Defendants in the Michigan Court of Claims under the pseudonym "John B15 Doe."

**E.   John Doe GL-4**

201.   Plaintiffs reallege and incorporate by reference the allegations in the previous and subsequent paragraphs.

202.   Plaintiff John Doe GL-4 is a 72-year-old man who resides in Michigan.

203.   Plaintiff John Doe GL-4 was seen by Anderson on one or two occasions in or about the Fall of 1969.

204.   Upon information and belief, Plaintiff John Doe GL-4 was seen by Anderson at University of Michigan University Health Services, believed to located at 207 Fletcher Street, Ann Arbor, MI 48109.

205.   During the Fall of 1969, Plaintiff John Doe GL-4 was a student at University of Michigan and was experiencing symptoms of mononucleosis.

206.   Plaintiff John Doe GL-4 walked into the University Health Services clinic and asked to be seen.  Plaintiff John Doe GL-4 was advised that Anderson was available and was asked if that was okay.

207.   During the examination by Anderson, Plaintiff John Doe GL-4 was directed to strip down.

208.   Anderson came up behind Plaintiff John Doe GL-4 and grabbed and fondled Plaintiff John Doe GL-4's genitals.

209.   Anderson touched Plaintiff John Doe GL-4's testicles for a prolonged period of time and attempted to cause Plaintiff John Doe GL-4 to get an erection.

210.   Anderson then performed a purported prostate examination on Plaintiff John Doe GL-4 that seemed to last for an inordinate and excessive amount of time.

211.   Upon information and belief, there was no legitimate medical reason for Anderson to perform a prostate examination on Plaintiff John Doe GL-4, and the "examination" was, in reality, sexual abuse perpetrated under the guise of medical treatment.

212.   At the time, due to representations made by Anderson and others at UM, Plaintiff John Doe GL-4 reasonably believed Anderson's conduct was medical care, treatment, and examination necessary for his health and wellbeing.

213.   Plaintiff John Doe GL-4 did not discover that Anderson's conduct was not legitimate medical care but instead intended for Anderson's own sexual gratification until February 2020, when various news reports revealed that multiple other survivors had experienced similar abuse and assaults.

214.   Plaintiff John Doe GL-4 did not consent to any touching for Anderson's sexual gratification.   Any implied or express consent was obtained by fraud and duress under the guise of medical treatment and examination.

215.   This incident of sexual assault and battery have embarrassed and humiliated Plaintiff John Doe GL-4, resulting in severe emotional distress affecting his day-to-day life. The emotional distress and damage caused by these events exists today and will likely last for the rest of his life. As the direct and proximate result of Anderson and Defendants' actions and/or inactions stated above, Plaintiff John Doe GL-4 has suffered discomfort and continues to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, PTSD with physical manifestations, anxiety, depression, sadness, loss of self-esteem, disgrace, fright, grief, humiliation, and loss of enjoyment of life, lack of trust or inability to trust others, was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earnings and earning capacity, as well as past, present, and future medical expenses.

40

216.   Plaintiff John Doe GL-4 has filed a notice of intention to file a claim against Defendants in the Michigan Court of Claims under the pseudonym "John B19 Doe."

**F.**   **John Doe GL-5**

217.   Plaintiffs reallege and incorporate by reference the allegations in the previous and subsequent paragraphs.

218.   Plaintiff John Doe GL-5 is a 54-year-old man who resides in Michigan.

219.   Plaintiff John Doe GL-5 was seen by Anderson approximately fifteen (15) to twenty (20) times, from in or about 1991 to in or about 1998.

220.   Upon information and belief, Plaintiff John Doe GL-5 was seen by Anderson at University of Michigan Medical Center, d/b/a Michigan Medicine, at 1500 E. Medical Center Dr., Ann Arbor, MI 48109, and at Health Care Associates at 4990 Clark Rd., Ypsilanti, MI 48197.

221.   Plaintiff John Doe GL-5 was referred to Anderson by another physician for treatment and management of low testosterone.

222.   Plaintiff John Doe GL-5's referral physician informed Plaintiff John Doe GL-5 that Anderson was an expert in andrology.

223.   When Plaintiff John Doe GL-5 arrived at the medical center / healthcare facility and was in Anderson's exam room, Anderson had Plaintiff John Doe GL-5 remove all of his clothes and did not provide Plaintiff John Doe GL-5 with a gown.

224.   Anderson examined Plaintiff John Doe GL-5's penis and testicles, spent a prolonged period of time fondling Plaintiff John Doe GL-5's penis and testicles, and spent a very long time measuring Plaintiff John Doe GL-5's penis.

225.   When Anderson would touch and fondle Plaintiff John Doe GL-5's penis, Anderson's breathing would change to suggest that Anderson was becoming sexually aroused.

226.   Anderson took multiple photographs of Plaintiff John Doe GL-5's nude body, and asked Plaintiff John Doe GL-5 to provide nude photographs for him as well.

227.   Anderson also performed purported prostate examinations that seemed to last an inordinate and excessive amount of time.

228.   Upon information and belief, there was no legitimate medical reason for Anderson to perform prostate examinations on Plaintiff John Doe GL-5, and the "examination" was, in reality, sexual abuse perpetrated under the guise of medical treatment.

229.   The aforementioned events occurred at every single visit Plaintiff John Doe GL-5 had with Anderson, at both locations.

230.   Plaintiff John Doe GL-5 felt humiliated and uncomfortable with the way Anderson "examined" him and wanted to spend time looking at and measuring

his penis, and he felt the pictures were an invasion of his privacy, but Plaintiff John Doe GL-5 was young and he felt that Anderson was a professional.

231.   At the time, due to representations made by Anderson and others at UM, Plaintiff John Doe GL-5 reasonably believed Anderson's conduct was medical care, treatment, and examination necessary for treatment of his low testosterone.

232.   Plaintiff John Doe GL-5 did not discover that Anderson's conduct was not legitimate medical care, but instead intended for Anderson's own sexual gratification, until February 2020, when various news reports revealed that multiple other survivors had experienced similar abuse and assaults.

233.   Plaintiff John Doe GL-5 did not consent to any touching for Anderson's sexual gratification.   Any implied or express consent was obtained by fraud and duress under the guise of medical treatment and examination.

234.   These incidents of sexual assault and battery have embarrassed and humiliated Plaintiff John Doe GL-5, resulting in severe emotional distress affecting his day-to-day life. The emotional distress and damage caused by these events exists today and will likely last for the rest of his life. As the direct and proximate result of Anderson and Defendants' actions and/or inactions stated above, Plaintiff John Doe GL-5 has suffered discomfort and continues to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, PTSD with physical manifestations, anxiety,  sadness, loss of self-esteem, disgrace,

fright, grief, humiliation, and loss of enjoyment of life, lack of trust or inability to trust others, was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earnings and earning capacity, as well as past, present, and future medical expenses.

235.   Plaintiff John Doe GL-5 has filed a notice of intention to file a claim against Defendants in the Michigan Court of Claims under the pseudonym "John B21 Doe."

### G.    John Doe GL-6

236.   Plaintiffs reallege and incorporate by reference the allegations in the previous and subsequent paragraphs.

237.   Plaintiff John Doe GL-6 had approximately 8 appointments with Anderson between approximately 1998 and 2000, when Plaintiff John Doe GL-6 was a young adult.

238.   Plaintiff John Doe GL-6 was seen by Anderson at Schembechler Hall Training Room and Medical Offices, located at 1200 South State Street, Ann Arbor, MI 48109.

239.   Plaintiff John Doe GL-6 was a student athlete who attended the University of Michigan.

240.   From 1998 to 2000, Plaintiff John Doe GL-6 was on the university

football team.

241.   Plaintiff John Doe GL-6 understood Anderson to be the "team doctor."

242.   Plaintiff John Doe GL-6 was sexually abused three years in the late 1990s into the early 2000s.

243.   At all visits, Plaintiff John Doe GL-6 was seen in the Schembechler Hall Training Room and Medical Offices.

244.   Plaintiff John Doe GL-6 had approximately 8 visits with Anderson, and was abused at every visit, including the first.

245.   Plaintiff John Doe GL-6 experienced fondling of his penis and testicles at the first visit, which continued in every visit thereafter. During the last visit, Plaintiff John Doe GL-6 also experienced digital anal penetration, in addition to penis/testicle fondling.

246.   At the first visit, Plaintiff John Doe GL-6 was referred to Anderson by Defendants' then-athletic trainer Paul Schmidt, now assistant athletic director, for a sore throat.

247.   Despite telling Anderson that he had a sore throat, Plaintiff John Doe GL-6 was instructed to take his pants off, to which he complied.

248.   Anderson pulled Plaintiff John Doe GL-6's pants down and started to "pull" on Plaintiff John Doe GL-6's penis. Anderson proceeded to manipulate Plaintiff John Doe GL-6's penis and testicles, had Plaintiff John Doe GL-6 remove

his shirt, and fondled Plaintiff John Doe GL-6's chest, all without wearing gloves.

249.   There was no explanation of why Plaintiff John Doe GL-6's pants were pulled down or why Anderson needed to manipulate Plaintiff John Doe GL-6's penis and testicles for a sore throat.

250.   After examining Plaintiff John Doe GL-6's throat, Anderson gave Plaintiff John Doe GL-6 some antibiotics and sent him on his way.

251.   A short time later, during Plaintiff John Doe GL-6's freshman training camp, Defendants' head football trainer ordered the freshmen to line up in the hallway and wait to "drop ya drawers" for Anderson's physical.

252.   Once Plaintiff John Doe GL-6 entered the exam room, Anderson asked if Plaintiff John Doe GL-6 was feeling better from his sore throat. Anderson then instructed Plaintiff John Doe GL-6 to take off his shirt, and then started fondling Plaintiff John Doe GL-6's chest with his bare hands.

253.   Anderson proceeded to have Plaintiff John Doe GL-6 remove his pants, and asked Plaintiff John Doe GL-6 if he was sexually active and if he knew how to self-examine himself for STDs. Anderson then began to squeeze and massage Plaintiff John Doe GL-6's penis, and then asked Plaintiff John Doe GL-6  to repeat the same procedure as he watched.

254.   Anderson did not wear gloves during any portion of this "examination," which was really a sexual assault perpetrated by Anderson for his own prurient

sexual interests under the guise of medical treatment.

255.   Plaintiff John Doe GL-6 saw Anderson approximately six more times from 1998 to 2000. Each time Plaintiff John Doe GL-6 was sexually assaulted in the same or a similar manner.

256.   At Plaintiff John Doe GL-6's last appointment in or around the fall of 2000, Plaintiff John Doe GL-6 suffered a concussion with full loss of consciousness. When Plaintiff John Doe GL-6 came to, he was escorted to Anderson's exam room and left alone with him.

257.   In an impaired state, Plaintiff John Doe GL-6 was given an array of tests and exams, which included the physical touching and manipulation of Plaintiff John Doe GL-6's body; specifically, Plaintiff John Doe GL-6's penis, testicles, and buttocks—all without gloves. Plaintiff John Doe GL-6 was also given a full prostrate exam. All of this was done without Plaintiff John Doe GL-6's consent.

258.   At the time, due to representations made by Anderson and others at UM, Plaintiff John Doe GL-6 reasonably believed Anderson's conduct was medical care, treatment, and examination necessary for his health and participation in athletics.

259.   Plaintiff John Doe GL-6 did not discover that Anderson's conduct was not legitimate medical care but instead intended for Anderson's own sexual gratification until February 2020, when various news reports revealed that multiple

other survivors had experienced similar abuse and assaults.

260.   Plaintiff John Doe GL-6 did not consent to any touching for Anderson's sexual gratification. Any implied or express consent was obtained by fraud and duress under the guise of medical treatment and examination.

261.   These repeated incidents of sexual assault and battery have embarrassed and humiliated Plaintiff John Doe GL-6, resulting in severe emotional distress affecting his day-to-day life. The emotional distress and damage caused by these events exists today and will likely last for the rest of his life. As the direct and proximate result of Anderson and Defendants' actions and/or inactions stated above, Plaintiff John Doe GL-6 has suffered discomfort and continues to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, PTSD with physical manifestations, anxiety, depression, sadness, loss of self-esteem, disgrace, fright, grief, humiliation, and loss of enjoyment of life, was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, lack of trust or inability to trust others, and has sustained and continues to sustain loss of earnings and earning capacity, as well as past, present, and future medical expenses.

262.   Plaintiff John Doe GL-6 has filed a notice of intention to file a claim against Defendants in the Michigan Court of Claims under the pseudonym "John B27 Doe."

### H.     John Doe GL-7

263.   Plaintiffs reallege and incorporate by reference the allegations in the previous and subsequent paragraphs.

264.   Plaintiff John Doe GL-7 had approximately 12 appointments with Anderson between approximately 1997 and 2001, when Plaintiff John Doe GL-7 was a young adult.

265.   Plaintiff John Doe GL-7 was seen by Anderson at Schembechler Hall Training Room and Medical Offices, located at 1200 South State Street, Ann Arbor, MI 48109.

266.   Plaintiff John Doe GL-7 was a student athlete who attended the University of Michigan. From approximately 1997 to 2000, Plaintiff John Doe GL-7 was on the university football team.

267.   Plaintiff John Doe GL-7 understood Anderson to be the "team doctor."

268.   Plaintiff John Doe GL-7 would see Anderson for physicals and sports injuries.

269.   At all visits, Plaintiff John Doe GL-7 was seen in the Schembechler Hall Training Room and Medical Offices.

270.   Plaintiff John Doe GL-7 had approximately 12 visits with Anderson, and was sexually abused at every visit, including the first.

271.   Upon information and belief, Plaintiff John Doe GL-7 was referred to

Anderson by Defendants' athletic trainer Paul Schmidt and/or other of Defendants' athletic trainers.

272.   At all visits, Anderson directed Plaintiff John Doe GL-7 to remove his clothing.

273.   Anderson proceeded to manipulate Plaintiff John Doe GL-7's penis and testicles, fondled Plaintiff John Doe GL-7's chest, and performed a prostrate exam on Plaintiff John Doe GL-7, which included digital penetration into Plaintiff John Doe GL-7's anus.

274.   Upon information and belief, Anderson did not use gloves for any or, at least some, of the above-referenced actions.

275.   This happened every visit, regardless of what injury or treatment Plaintiff John Doe GL-7 was referred to Anderson for. For example, Plaintiff John Doe GL-7 saw Anderson for injuries such as a stress fracture in his foot and sprained and broken hands and fingers. There was no explanation of why Plaintiff John Doe GL-7 needed to remove his clothes or why Anderson needed to manipulate Plaintiff John Doe GL-7's penis and testicles for injuries in Plaintiff John Doe GL-7's hands or feet.

276.   Anderson also breathed heavily—suggesting sexual arousal—each time he performed the above-referenced actions.

277.   All of this was done without Plaintiff John Doe GL-7's consent.

50

278.   At the time, due to representations made by Anderson and others at UM, Plaintiff John Doe GL-7 reasonably believed Anderson's conduct was medical care, treatment, and examination necessary for his health and participation in athletics.

279.   Plaintiff John Doe GL-7 did not discover that Anderson's conduct was not legitimate medical care but instead intended for Anderson's own sexual gratification until February 2020, when various news reports revealed that multiple other survivors had experienced similar abuse and assaults.

280.   Plaintiff John Doe GL-7 did not consent to any touching for Anderson's sexual gratification. Any implied or express consent was obtained by fraud and duress under the guise of medical treatment and examination.

281.   These repeated incidents of sexual assault and battery have embarrassed and humiliated Plaintiff John Doe GL-7, resulting in severe emotional distress affecting his day-to-day life. The emotional distress and damage caused by these events exists today and will likely last for the rest of his life. As the direct and proximate result of Anderson and Defendants' actions and/or inactions stated above, Plaintiff John Doe GL-7 has suffered discomfort and continues to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, PTSD with physical manifestations, anxiety, depression, sadness, loss of self-esteem, disgrace, fright, grief, humiliation, and loss of enjoyment of life,

was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, lack of trust or inability to trust others, and has sustained and continues to sustain loss of earnings and earning capacity, as well as past, present, and future medical expenses.

282.   Plaintiff John Doe GL-7 has filed a notice of intention to file a claim against Defendants in the Michigan Court of Claims under the pseudonym "John B28 Doe."

## VI.   DEFENDANTS' FIDUCIARY RELATIONSHIP WITH PLAINTIFFS

283.   Plaintiffs reallege and incorporate by reference the allegations in the previous and subsequent paragraphs.

284.   Physicians like Anderson enjoy a power imbalance over patients, such as Plaintiffs, in treatment because patients present with health concerns and are expected to comply with physicians' orders, including undressing.  *See* Sexual Violation of Patients by Physicians: A Mixed-Methods, Exploratory Analysis of 101 Cases, Sexual Abuse 2019, Vol. 31(5) 503–523, available at https://journals.sagepub.com/doi/10.1177/1079063217712217.

285.   In addition to the power imbalance, patients like Plaintiffs often times cannot recognize abusive acts because they do not understand or know what is or is not medically necessary  *See* Sexual Violation of Patients by Physicians: A Mixed-

Methods, Exploratory Analysis of 101 Cases, Sexual Abuse 2019, Vol. 31(5) 503–523, available at https://journals.sagepub.com/doi/10.1177/1079063217712217.

286.   Among other reasons, it is this social power imbalance and the fact that "physicians possess superior knowledge by virtue of their medical training" that the American Medical Association finds the doctor-patient relationship to be a fiduciary relationship.   Tanya J. Dobash, Physician-Patient Sexual Conduct: The Battle Between the State and The Medical Profession, 50 Wash. & Lee L. Rev. 1725 (1993); s.  See also, https://scholarlycommons.law.wlu.edu/wlulr/vol50/iss4/17. ;

287.   In the same way, both the Sixth Circuit Court of Appeals and Michigan courts recognize this fiduciary relationship between a doctor and his patient, where "the patient necessarily reposes a great deal of trust not only in the skill of the physician but in his discretion as well".  *United States v. Tatum*, 518 F.3d 369, 373 (6th Cir. 2008); *Hammonds v. Aetna Cas. & Sur. Co.,* 7 Ohio Misc. 25 (N.D. Ohio 1965); *Utica Steel, Inc. v. Amormino,* No. 309112, 2014 WL 1401939, at *6 (Mich. App. Apr. 10, 2014).

288.   As pled above, UM ordered Plaintiffs to see Dr. Anderson, and only Dr. Anderson, as UM-assigned primary care physician during the time Plaintiffs were members of UM athletic teams and/or otherwise saw Anderson, despite knowing he was a sexual predator of primarily male student-athletes.

289.   In this way, UM created a fiduciary relationship between Dr. Anderson and Plaintiffs.

290.   Further, in doing so, UM became a fiduciary, both directly and vicariously, of Plaintiffs for all acts by Dr. Anderson during Anderson's physician-patient relationship with Plaintiffs.

291.   And because UM forced this relationship on Plaintiffs – a fiduciary relationship with Plaintiff's UM-chosen physician, Dr. Anderson – UM as a principal to its agent, Dr. Anderson owed certain duties under fiduciary and agency law to provide Plaintiffs with more, not less information, regarding the true nature of Anderson's acts done during the course of medical treatment on Plaintiffs.

## VII.   **FRAUDULENT CONCEALMENT**

292.   Plaintiffs reallege and incorporate by reference the allegations in the previous and subsequent paragraphs.

293.   Pursuant to Michigan law, the statute of limitations for a cause of action is tolled when "a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim" under M.C.L. § 600.5855.

294.   Both Anderson and Defendants, through their employees, agents, and representatives, including but not limited to athletic coaches, trainers, and directors,

fraudulently concealed the existence of Plaintiff's claims, both before and after Plaintiff's initial examination with Dr. Anderson, by, without limitation: (1) concealing from Plaintiffs that the uncomfortable procedures conducted during medical examinations were in fact sexual abuse; (2) concealing from Plaintiffs that UM and its employees, agents, and representatives were aware of Anderson's sexual abuse and did nothing to stop it; (3) affirmatively telling Plaintiffs that the procedures were normal and/or necessary; (4) publishing a statement that Anderson was a renowned physician to be trusted and respected in a publication delivered to and read by university students; and (5) concealing from Plaintiffs that UM was aware of Anderson's abuse since at least 1968, thereby concealing UM's identity from Plaintiffs as a "person who is liable for the claim," as set forth in more detail below.

### A.   Anderson's Fraudulent Concealment Imputed to Defendants.

295.   Plaintiffs reallege and incorporate by reference the allegations in the previous and subsequent paragraphs.

296.   Anderson made affirmative representations to Plaintiff, referred to collectively as "Anderson's representations," that:

a.   Anderson's anal penetrations and/or genital examinations were normal, necessary, proper, appropriate, legitimate, and/or medically beneficial;

b.   Anderson's anal penetrations and/or genital examinations were normal,

necessary, proper, appropriate, legitimate, and/or medically beneficial, when the patient is a healthy male between the ages of 17 and 24, with no reported issues related to his genitals and/or anus;

c.   Anderson's anal penetrations and/or genital examinations were just another required procedure athletes must endure as a part of the systemic athletic department culture in which athletes were rigorously disciplined to obey without question every requirement related to improving their physical health and, in doing so, adapting to overcome high levels of emotional, physical, and psychological stress and challenges; and,

d.   Defendants, through their employees, agents, and representatives, including but not limited to athletic coaches, trainers, and directors, were aware of Anderson's treatments, that they still required Plaintiffs to be subjected to it, and that they believed the treatments to be normal, necessary, proper, appropriate, legitimate, and/or medically beneficial.

297.   Anderson's representations were false. UM Public Safety Department's recent investigation involving contact with medical professionals establishes that extended genital examinations and digital anal penetrations are almost never needed for any medical treatment of any issues normally experienced by college athletes.

298.   Anderson knew the representations were false. He conducted the sexual

assaults for no reason other than for his own empowerment, sexual gratification, and/or pleasure. Anderson knew the genital examinations and/or digital anal examinations were not proper, appropriate, legitimate, and/or considered within the standard of care by any physician of any specialty and/or sports therapist, particularly as the patients were young men (generally ages 17-25).

299.   Further, over the course of treating Plaintiffs and others, on multiple occasions Anderson represented and stated his acts were "protocol", "what was necessary", "had to be done", or similar phrases, and/or Anderson represented that he was checking for an illness unrelated to the athlete's complaint that gave rise to the visit to Dr. Anderson, such as prostate and/or testicular cancer.

300.   These remarks normalized Anderson as just part of the comprehensive and thorough nature of major college sports, and major college physicals, such that it happened to everyone and was not outside the norm and was the medical equivalent of a new and arduous drill or conditioning technique that Plaintiffs encountered at UM.

301.   Anderson's representations were material, in that had Plaintiffs known the representations were false, Plaintiffs would have stopped seeking treatment from Anderson immediately.

302.   Anderson's representations were made with the intent that Plaintiffs would rely on them as Anderson sought to continue sexually assaulting Plaintiffs

and others, evidenced by the fact that Anderson did, in fact, continue sexually assaulting Plaintiffs and others.

303.  Anderson's representations were also made with the intent of concealing from Plaintiffs that they had a cause of action against Anderson and/or UM.

304.  Plaintiffs did, in fact, rely on Anderson's representations; indeed, Anderson's representations led Plaintiffs to continue seeking treatment from Anderson, and had they known Anderson's representations were false, Plaintiffs would have stopped treating with Anderson.

305.  Anderson knew that Plaintiffs were, in fact, particularly susceptible to believing Anderson's misrepresentations because:

a.   Anderson's abuse continued while Plaintiffs were young and naïve adults—many of whom were living away from their parents for the very first time;

b.   Anderson's representations were made within the context of a pervasive culture created by statements made by representatives of UM, including coaches, trainers, directors, and other leaders of the Athletic Department, that Anderson's treatments were necessary, and Anderson was a competent and ethical physician, to be trusted and never questioned;

58

c.      Plaintiffs had little or no prior experience with legitimate and appropriately performed treatments that involve genital examinations and digital anal penetrations, so it was impossible for Plaintiffs to differentiate a legitimate and appropriately performed genital or anal examination from a sexual assault;

d.      Plaintiffs could not have possibly known because there were no parents, coaches, guardians, caregivers, and/or other medical professionals in the room during the genital and anal examinations to observe, question, and/or discover that Anderson's treatments were sexual assaults, and this concealment from other adults deprived them of the opportunity to inform Plaintiffs that they had been sexually assaulted and had a cause of action;

e.      Based on Neuroscience, the prefrontal cortex of the brain, which we use to make decisions and distinguish right from wrong, is not fully formed until around the age of 25;

f.      Based on Neuroscience, as the prefrontal cortex of the brain matures young people are able to make better judgments;

g.      Plaintiffs were intimidated by Anderson's notoriety and reputation and therefore believed his representations;

h.      Plaintiffs trusted Anderson due to his notoriety and reputation;

i.     Plaintiffs were compelled by Anderson to undergo genital and anal
       examinations like other athletes and not question them if they wanted
       to stay on the team and/or remain at UM to earn their college degree;

j.     Plaintiffs were not aware of any other students coming forward with
       allegations of abuse, particularly since Anderson and UM concealed
       any such allegations from students and the public in general and since
       the culture of the Athletic Department normalized Anderson's
       treatments;

k.     Plaintiffs had never previously heard about allegations in the media
       regarding sexual assaults or misconduct by Anderson, indeed because
       there was none; and

l.     Plaintiffs were never told by Anderson that his conduct was sexual in
       nature, unlike other victims of sexual abuse who are typically told by
       their perpetrators that their conduct is of a sexual nature and to conceal
       the sexual conduct from parents and others.

306.   Accordingly, Plaintiffs did not know, could not have reasonably
known, and were reasonably unaware of a possible cause of action that they had
against Anderson and/or UM until they read an article on or about February 19, 2020,
or heard of said article thereafter, regarding a complaint filed with UM's Police
Department by a student abused by Anderson, at which point Plaintiffs became

aware they were victims of sexual assault and that UM indirectly or directly caused the abuse by being aware Anderson was a sexual predator and failing to stop Anderson from harming students.

307.   Anderson also breached a fiduciary duty to Plaintiffs, as they were his patients entrusted to Andersons's care, and so his failure to disclose material information to Plaintiffs was fraudulent.

308.   Anderson further concealed the fraud by affirmative acts that were designed and/or planned to prevent inquiry, so he and Defendants could escape investigation, in that he:

    a.    prevented other medical professionals, coaches, trainers, parents, guardians, and/or caregivers from being in the room during examinations and treatments of Plaintiffs while he sexually assaulted Plaintiffs; and

    b.    did not abide by or follow the standard of care which requires another medical professional, coach, trainer, parent, guardian, and/or caregiver be in the room during the examination and treatment of patients.

309.   Anderson's representations caused Plaintiffs' injuries related to: (1) the sexual assaults; (2) discovering Anderson's uncomfortable treatments were in fact sexual assault on or about February 19, 2020; and (3) discovering Plaintiffs' beloved alma mater that they devoted their lives to, in many respects, betrayed them by

placing them in the care of a known sexual predator.

310.   Plaintiffs incorporate, by reference, the paragraphs above and below regarding damages suffered by Plaintiffs as a result of UM's responsibility for Anderson's sexual assaults, UM's awareness and responsibility for Anderson's fraudulent misrepresentations about the sexual assaults, and/or UM's fraudulent misrepresentations.

311.   Anderson committed Fraudulent Concealment by concealing fraud with affirmative acts designed and/or planned to prevent inquiry, so he and Defendants escape investigation.

312.   At all times pertinent to this action, Anderson was an agent, apparent agent, servant, and/or employee of UM and operated within the scope of his employment, and his negligence is imputed to UM.

313.   At all times material here, Plaintiffs were free of any negligence contributing to the injuries and damages alleged.

**B.     Defendants' Fraudulent Concealment.**

314.   Plaintiffs reallege and incorporate by reference the allegations in the previous and subsequent paragraphs.

315.   Defendants, through their employees, agents, and representatives, including but not limited to athletic coaches, trainers, athletic directors, other athletic department representatives, and members of UM's administration, made affirmative

representations to Plaintiffs, referred to collectively as "Defendants' representations," that:

a. Anderson was to be trusted and not questioned, and his devotion to medical care at UM was worthy of public recognition and celebration, stating: "The University Health Service staff wish to acknowledge the 11 years of leadership provided by Robert E. Anderson, M.D. In January of 1980, Anderson resigned as Director of the University Health Service to devote more time to his clinical field of urology/andrology and athletic medicine…his many contributions to health care are acknowledged…The University Health Service staff wish to thank Anderson for his years of leadership and to dedicate the Annual Report to him," published in the Acknowledgement preface of Volume III of the President's Report of THE UNIVERSITY OF MICHIGAN for 1979-1980;

b. Anderson was to be trusted and not questioned as his services were worthy of recognition by UM dedicating "the Annual Report to him" even though UM and its executives knew that Easthope had fired Anderson for his inappropriate sexual conduct toward male students;

c. Anderson's genital groping and/or digital anal penetrations were normal, necessary, proper, appropriate, legitimate, and/or medically

63

beneficial;

d.      Anderson's genital groping and/or digital anal penetrations were normal, necessary, proper, appropriate, legitimate, and/or medically beneficial, when the patient is a healthy male between the ages of 17 and 25, with no reported issues related to his genitals;

e.      Anderson would treat their ailments and injuries in an ethical and competent, and therefore non-criminal, manner;

f.      Anderson's genital groping and/or digital anal penetrations were just another required procedure athletes must endure as a part of the systemic athletic department culture in which athletes were rigorously disciplined to obey without question every requirement related to improving their physical health and, in doing so, adapting to overcome high levels of emotional, physical, and psychological stress and challenges; and,

g.      There was nothing wrong with anything Dr. Anderson did and so there was no possible cause to complain against Anderson and/or UM.

h.      These affirmative representations were reasserted each time Defendants, their agents in the Athletic Department, head coaches, assistant coaches, and trainers sent an athlete to Dr. Anderson for treatment as each order to see Dr. Anderson was an affirmative

representation that Dr. Anderson was competent, ethical, and would "do no harm", or assault the respective athletes.

316. Defendants' representations were false. UM's Public Safety Department's recent investigation involving contact with medical professionals establishes that extended genital examinations and digital anal penetrations are almost never needed for any physical or medical treatment of any other issues normally experienced by college athletes.

317. Defendants knew the representations were false. Defendants received several complaints since, at least, 1968 about Anderson's sexual assaults prior to Plaintiffs arriving on campus. Indeed, Defendants removed Anderson from his position as UHS Director in 1979 because of sexual assault allegations, thereby demonstrating UM's knowledge the representations were false.

318. Defendants made the material representations, knowing they were false and/or made the material representations recklessly, without any knowledge of their truth and as a positive assertion, in that they had previously received strikingly similar complaints of abuse by Anderson from other students and student athletes and knew that the appropriateness of his genital examinations and digital anal penetrations had been questioned in the past.

319. Defendants' representations were material, in that had Plaintiffs known the representations were false, they would have stopped seeking treatment from

Anderson immediately.

320.   Defendants' representations were made with the intent that Plaintiffs would rely on them as UM sought to prevent Plaintiffs from discovering they had a cause of action against Anderson and/or UM, and to prevent the tarnishing of UM's brand throughout the country.

321.   Plaintiffs did, in fact, rely on Defendants' representations; indeed, the representations led Plaintiffs to continue seeking treatment from Anderson, and had they known the representations were false, Plaintiffs would have stopped treating with Anderson.

322.   Defendants concealed the fraud by affirmative acts that were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of fraud, in that they:

a.   Refused to terminate Anderson and thus validated him through continued employment as a physician with one of the world's great institutions of higher learning;

b.   Affirmatively lied in written publications about Anderson "resigning" from UHS when he was fired, and then reinstated but demoted him, for assaults on male students;

c.   Ignored, refused, and failed to inquire, question, and investigate the complaints and take action regarding Anderson's genital and anal

examinations; and,

d.   Did not create a policy to require adults, parents, chaperones, guardians, and/or caregivers be present during an examination of a minor or young athlete by a physician.

323.   Defendants knew that Plaintiffs were, in fact, particularly susceptible to believing Defendants' representations because:

a.   Anderson's abuse occurred while Plaintiffs were young and naïve adults—many of whom were living away from home and their parents for the first time in their lives;

b.   Defendants' representations were made within the context of a pervasive culture created by statements made by UM representatives, including coaches, trainers, directors, and other leaders of the Athletic Department, that Anderson's treatments were necessary, and Anderson was a competent and ethical physician, to be trusted and never questioned;

c.   Plaintiffs had little or no prior experience with legitimate and appropriately performed treatments that involve extended genital examinations and digital anal penetrations, so it was impossible for Plaintiffs to differentiate a legitimate and appropriately performed genital and/or anal examinations from a sexual assault;

67

d.   Plaintiffs could not have possibly known because there were no parents, coaches, guardians, caregivers, and/or other medical professionals in the room during the genital and anal examinations to observe, question, and/or discover that his genital examinations were sexual assaults and inform Plaintiffs that they had been sexually assaulted and had a cause of action;

e.   Based on Neuroscience, the prefrontal cortex of the brain, which we use to make decisions and distinguish right from wrong, is not fully formed until around the age of 25;

f.   Based on Neuroscience, as the prefrontal cortex of the brain matures young people are able to make better judgments;

g.   Plaintiffs were intimidated by Anderson's notoriety and reputation and therefore believed his representations and followed protocol of football program to allow Anderson to act on Plaintiffs;

h.   Plaintiffs relied on the Athletic Department and trusted Anderson due to his notoriety and reputation;

i.   Plaintiffs were compelled by Anderson to undergo improper genital examinations like other athletes and patients and not question them if they wanted to stay on the team and/or remain at UM to earn their college degree;

j.     Plaintiffs had no reason to believe or be aware of any other students coming forward with allegations of abuse, particularly since Anderson and UM concealed any such allegations and since the culture of the Athletic Department normalized Anderson's treatments;

k.     Plaintiffs had never previously heard about any allegations in the media regarding sexual assaults or misconduct by Anderson; and

l.     Plaintiffs were never told by Anderson that his conduct was sexual in nature, unlike other victims of sexual abuse who are typically told by their perpetrators that their conduct is of a sexual nature and to conceal the sexual conduct from their parents and others.

324.   Accordingly, Plaintiffs did not know, could not have reasonably known, and were reasonably unaware of a possible cause of action that they had against Anderson and/or Defendants until they read an article on or about February 19, 2020, or heard of the same subsequently thereafter, regarding a complaint filed with UM's Police Department by a student abused by Anderson, at which point Plaintiffs became aware they were victims of sexual assault and that Defendants indirectly or directly caused the abuse by being aware Anderson was a sexual predator and failing to stop him from harming students.

325.   In addition to affirmative false representations, UM coaches, officials, agents, and representatives failed to disclose to Plaintiffs that they were being

sexually abused and that Anderson had a history of committing sexual assaults in the guise of medical treatment.

326.   Because UM had a fiduciary duty to Plaintiffs, and it employed Anderson who had a doctor-patient relationship with Plaintiffs, the failure to disclose material information is also fraudulent.

327.   At all times pertinent to this action, the sports medicine trainers, trainers, employees, staff, managers, supervisors, coaches, and directors of Defendants were agents, apparent agents, servants, and employees of Defendants and operated within the scope of their employment and their Fraudulent Concealment is imputed to Defendants.

328.   Further, many of the Plaintiffs (and their parents) trusted and relied on their coaches' specific representations during their recruitment process that they would take care of and protect Plaintiffs during their athletic careers at UM, including, among others, taking care of Plaintiffs: (a) athletic needs through excellent coaching and training; (b) academic needs through tutoring and other academic support provided by UM and its Athletic Department, if needed, and (c) medical needs through free quality health care to treat any injuries and illnesses Plaintiff incurred during his time on the team, which included access to UM's world-renowned hospital and a team of excellent doctors who were excellent, ethical, and would only do good, not harm, for the Plaintiff during the course of his medical

70

treatments.

329.   Further, as pled above, during Plaintiffs time as athletes for UM, Plaintiffs' coaches and trainers repeatedly told Plaintiffs that they would get the best medical treatment from UM's excellent medical facilities and doctors and trainers, and that all medical treatment (and each individual treatment) would only be treatment that was medically necessary to treat his injury or illness, and that treatment would only be for the purposes of healing the Plaintiff, and doing the Plaintiffs no harm.

330.   Defendants' representations caused Plaintiffs' injuries related to (1) the sexual assaults; (2) discovering Anderson's uncomfortable treatments were in fact sexual assault on or about February 19, 2020; and (3) discovering Plaintiffs' beloved alma mater that they devoted their life to, in many respects, betrayed them by placing them in the care of a known sexual predator.

331.   Plaintiffs incorporate, by reference, the paragraphs above and below regarding damages suffered by Plaintiffs as a result of UM's responsibility for Anderson's sexual assaults, UM's awareness and responsibility for Anderson's fraudulent misrepresentations about the sexual assaults, and/or UM's fraudulent misrepresentations.

332.   Defendants committed Fraudulent Concealment, as described in detail above and below.

## COUNT I:
## VIOLATION OF TITLE IX, 20 U.S.C. § 1681(A), *ET SEQ.*[2]

333.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

334.   Title IX's statutory language states, "No person in the United States shall on the basis of sex, be ... subject to discrimination under any education program or activity receiving Federal financial assistance ..."

335.   Plaintiffs are "person[s]" under the Title IX statutory language.

336.   UM receives federal financial assistance for its education program and is therefore subject to the provisions of Title IX (of the Education Act of 1972, 20 U.S.C. § 1681(a), *et seq.*

337.   UM is required under Title IX to investigate allegations of sexual assault, sexual abuse, and sexual harassment.

338.   The U.S. Department of Education's Office of Civil Rights has explained that Title IX covers all programs of a school, and extends to sexual harassment and assault by employees, students, and third parties.

339.   Anderson's actions and conduct were carried out under one of UM programs, which provides medical treatment to students, athletes, and the public.

---

[2] Plaintiffs outline their damages, which are needed for many of the following counts, in general allegations at the end of the counts section below, and those general damage allegations are incorporated by reference into all applicable counts to avoid excessive redundancy and for ease of reading by the Court.

340.   Anderson's conduct and actions toward Plaintiffs, that being, without limitation, nonconsensual genital manipulation and/or anal penetration for Anderson's sexual gratification, constitutes sex discrimination under Title IX.

341.   As early as 1968, or earlier, an "appropriate person" at UM had actual knowledge of the sexual assault, abuse, and molestation of young men committed by Anderson.

342.   Specifically, Defendants were notified about Anderson's sexual abuse and molestation by young male students in or around 1968, 1975, 1979, and, on information and belief, on many other occasions before and after 1980.

343.   Defendants failed to carry out their duties to investigate and take corrective action under Title IX following the complaints of sexual assault, abuse, and molestation in or around 1968.

344.   After the 1968, 1975, and 1979 complaints, Anderson continued to sexually assault, abuse, and molest young male students, and later exclusively male athletes, including but not limited to Plaintiffs.

345.   Defendants acted with deliberate indifference to known acts of sexual assault, abuse, and molestation on its premises by:

   a.   Failing to investigate and address other victim's allegations as required by Title IX;

   b.   Failing to adequately investigate and address the complaints regarding

Anderson's conduct; and,

c.      Failing to institute corrective measures to prevent Anderson from violating and sexually abusing other students and individuals, including minors.

346.   Defendants acted with deliberate indifference as their lack of response to the allegations of sexual assault, abuse, and molestation was clearly unreasonable in light of the known circumstances.

347.   Defendants' responses were clearly unreasonable as Anderson continued to sexually assault athletes and other individuals and Plaintiffs until Anderson retired from UM in 2003.

348.   Between the dates of approximately 1968-2003, and perhaps earlier, Defendants acted in a deliberate, grossly negligent, and/or reckless manner when they failed to respond or were deliberately indifferent to Anderson's sexual assaults and sex-based harassment of young male students, and later young male student athletes, on and off school premises.

349.   Defendants' failure to promptly and appropriately investigate and remedy and respond to the sexual assaults after they received notice subjected Plaintiffs to further harassment and a sexually hostile environment, effectively denying his access to educational opportunities at UM, including medical care.

74

## COUNT II:
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 – STATE CREATED DANGER

350.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

351.   The due process clause of the 14th Amendment provides that the state may not deprive a person of life, liberty, or property without due process of law.

352.   Defendants deliberately exposed Plaintiffs to a dangerous sexual predator, Anderson, knowing Anderson could and would cause serious damage by sexually assaulting male students, especially male student athletes, on campus.

353.   This conduct was culpable in the extreme.

354.   Plaintiffs were a foreseeable victim of Defendants' decision to retain Anderson after the first report of abuse, and then to make Anderson the physician to UM Athletic Department and to not completely terminate their relationship with Anderson following credible, self-admitted, and verified claims that Anderson was sexually abusing patients under the guise of medical treatment.

355.   Plaintiffs' sexual assault was foreseeable and direct.

356.   The decisions and actions to deprive Plaintiffs of a safe campus and to subject them to sexual abuse by Anderson constitute affirmative acts that caused and/or increased the risk of harm, as well as physical and emotional injury, to Plaintiff.

357.   Defendants acted in willful disregard for the safety of Plaintiffs.

358.   Defendants have a fiduciary duty to protect students, like Plaintiffs, from harm—especially known harms; and Defendants breached that duty by allowing Plaintiffs' sexual assaults by placing them in the care of a known sexual predator.

359.   Defendants created the opportunity for Anderson to sexually assault Plaintiffs that he would not otherwise have had the opportunity to do but for Defendants giving Anderson the job as Athletic Department physician when it was known to Defendants—and Anderson, in fact, admitted—that he was a sexual predator.

360.   At all relevant times, Defendants and Anderson (as Defendants' agent) were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or Defendants.

## COUNT III:
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 – RIGHT TO BODILY INTEGRITY

361.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

362.   The due process clause of the 14th Amendment includes an implied right to bodily integrity.

363.   Plaintiffs enjoy the constitutionally protected Due Process right to be free from the invasion of bodily integrity through sexual assault, abuse, or molestation.

364.   At all relevant times, Defendants and Anderson were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or Defendants.

365.   The acts as alleged above amount to a violation of these clearly established constitutionally protected rights, of which reasonable persons in Defendants' positions should have known.

366.   As a matter of custom, policy, and/or practice, Defendants had and have the ultimate responsibility and authority to investigate complaints against their employees, agents, and representatives from all individuals including, but not limited to students, visitors, faculty, staff, or other employees, agents, and/or representatives, and failed to do so with deliberate indifference.

367.   Defendants had a duty to prevent sexual assault, abuse, and molestation on their campus and premises, that duty arising under the above-referenced constitutional rights, as well as established rights pursuant to Title IX.

368.   Defendants' failure to address these patients' complaints led to an unknown number of individuals (aside from Plaintiffs) being victimized, sexually assaulted, abused, and molested by Anderson.

369.    Additionally, Defendants' failure to properly address the 1968, 1975, 1979, and other complaints regarding Anderson's sexually assaultive conduct also led to others being victimized, sexually assaulted, abused and molested by Anderson. Indeed, all that UM needed to do was fire Anderson in 1979 (or earlier).

370.    Ultimately, Defendants failed to adequately and properly investigate the complaints of Plaintiffs or other similarly situated individuals including but not limited to failing to:

a.    Not foist Anderson on the population of scholarship male athletes, who were accustomed to physical and emotional discomfort, and because they needed the scholarships, would be less likely to complain about Anderson's conduct;

b.    Perform a thorough investigation into improper conduct by Anderson after receiving complaints; and

c.    Thoroughly review and investigate all policies, practices, procedures and training materials related to the circumstances surrounding the conduct of Anderson.

371.    By failing to prevent the aforementioned sexual assault, abuse, and molestation upon Plaintiffs, and by failing to appropriately respond to reports of Anderson's sexual assault, abuse, and molestation in a manner that was so clearly unreasonable it amounted to deliberate indifference, Defendants are liable to

Plaintiffs pursuant to 42 U.S.C. § 1983.

372. Defendants are also liable to Plaintiffs under 42 U.S.C. § 1983 for maintaining customs, policies, and practices which deprived Plaintiffs of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

373. Defendants tolerated, authorized and/or permitted a custom, policy, practice or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline Anderson, with the result that Anderson was allowed to violate the rights of persons such as Plaintiffs with impunity.

## COUNT IV:
## FAILURE TO TRAIN AND SUPERVISE UNDER 42 U.S.C. § 1983

374. Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

375. Defendants have the ultimate responsibility and authority to train and supervise their employees, agents, and/or representatives including Anderson and all faculty and staff regarding their duties toward students, faculty, staff and visitors.

376. Defendants failed to train and supervise their employees, agents, and/or representatives including all faculty and staff, regarding the following duties:

a. Perceive, report, and stop inappropriate sexual conduct on campus;

b. Provide diligent supervision over student-athletes and other individuals, including Anderson;

79

    c.      Report suspected incidents of sexual abuse or sexual assault;

    d.      Ensure the safety of all students, faculty, staff, and visitors to UM's campuses premises;

    e.      Provide a safe environment for all students, faculty, staff, and visitors to UM's premises free from sexual harassment; and,

    f.      Properly train faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment.

    g.      The above list of duties is not exhaustive.

377.  Defendants failed to adequately train coaches, trainers, medical staff, and others regarding the aforementioned duties which led to violations of Plaintiffs' rights.

378.  Defendants' failure to adequately train was the result of Defendants' deliberate indifference toward the well-being of student-athletes.

379.  Defendants' failure to adequately train is closely related to or actually caused Plaintiffs' injuries.

380.  As a result, Defendants deprived Plaintiffs of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

## COUNT V:
## VIOLATION OF THE ELLIOTT-LARSEN ACT, M.C.L. § 37.2101 *ET SEQ.* (SEX DISCRIMINATION)

381.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

382.   UM is a place of public accommodation, a public service, and an educational institution as defined in Michigan's Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq.* (ELCRA).

383.   Anderson was a "person" as that term is defined in the ELCRA and was an agent of UM.

384.   Plaintiffs' sex was at least one substantial factor motivating Anderson to select Plaintiffs as victims of his sexual assault.

385.   By giving Anderson access to Plaintiffs, as his treating physician on UM's campus, Defendants, through agents, representatives, and employees, including Anderson were predisposed to discriminate based on Plaintiffs' sex and acted in accordance with that predisposition.

386.   Defendants violated the ELCRA and deprived Plaintiffs of their civil rights by, among other things, subjecting Plaintiffs, because of their sex, to conduct of a physical and sexual nature that had the purpose or effect of denying Plaintiffs the full benefit of the educational program of UM and full and equal access to the use and privileges of public accommodations, public service, and educational

opportunity.

## COUNT VI:
## VIOLATION OF ARTICLE 1, § 17 SUBSTANTIVE DUE PROCESS – BODILY INTEGRITY

387.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

388.   The Due Process Clause of the Michigan Constitution provides, in pertinent part, that "[n]o person shall . . . be deprived of life, liberty or property, without due process of law. . . ." Const 1963, art 1, § 17.

389.   The due process guarantee of the Michigan Constitution is coextensive with its federal counterpart. The doctrine of substantive due process protects unenumerated fundamental rights and liberties under the Due Process Clause of the Fourteenth Amendment and Const 1963, art 1, § 17.

390.   The substantive component of due process encompasses, among other things, an individual's right to bodily integrity free from unjustifiable government interference.

391.   In a long line of cases, courts have held that, in addition to the specific freedoms protected by the Bill of Rights, the "liberty" specially protected by the Due Process Clause includes the right to bodily integrity.

392.   The right to be free of state-occasioned damage to a person's bodily integrity is protected by the fourteenth amendment guarantee of due process and

Const 1963, art 1, § 17.

393.   The violation of the right to bodily integrity involves an egregious, nonconsensual entry into the body which was an exercise of power without any legitimate governmental objective.

394.   The United States Supreme Court and the Michigan appellate courts have recognized that no right is held more sacred, or is more carefully guarded, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.

395.   The violation of the right to bodily integrity must be so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.

396.   Defendants' official policies, customs and practices violated include:

a.   Failing to supervise, train and educate Anderson, Anderson's managers and/or Anderson's patients or their parents so that in the absence of this supervision, training and education Anderson's unlawful activities could be carried out;

b.   Actively concealing Anderson's abhorrent behavior; and

c.   Purposefully placing Anderson in the position as Athletic Department physician, despite knowing he sexually preyed on male students under the guise of medical treatment, further enabling Anderson to have

unfettered sexual access to more students.

397. Defendants' policies, customs and practices of permitting, condoning, and reassigning Anderson, which enabled him to gain unfettered sexual access to students, exposed students to unspeakable invasions of their bodily integrity which were so egregious and outrageous that it shocks the conscience.

398. The decisions which resulted in Defendants' violating Plaintiffs' constitutional rights under the Michigan Constitution as alleged in this Complaint were made by high level officials of Defendants.

## COUNT VII:
## VIOLATION OF ARTICLE 1, § 17 SUBSTANTIVE DUE PROCESS – STATE CREATED DANGER

399. Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

400. Plaintiffs enjoyed a substantive due process right under the Michigan Constitution to avoid the risk of harm or danger created or increased by an affirmative act of the state.

401. This right is violated when Defendants: (1) engaged in an affirmative act which either created or increased the risk that Plaintiffs would be exposed to an act of violence by a third party; (2) placed Plaintiffs in a special danger, as distinguished from a risk that affects the public at large; and, (3) knew or should have known that its actions specifically endangered Plaintiffs.

402.   Defendants' affirmative acts consisted of (1) permitting, condoning, and reassigning Anderson so that he could have sexual access to male student-athletes under the guise of medical treatment and then (2) concealing its knowledge that Anderson, by virtue of state policy, practice or custom was permitted to carry out his unlawful and abhorrent behavior.

403.   These affirmative acts created or increased the risk that Plaintiffs would be exposed to an act of violence or sexual assault by Anderson.

404.   Defendants' conduct created a special danger to the majority of Plaintiffs and others like them because the state's (UM's) actions specifically put this discrete group – male athletes, most of whom cannot complain about "medical treatment" or risk being kicked off the team – at increased risk in that the state knew that Anderson was taking advantage of the sacred patient-physician relationship in order to carry out his violence against Plaintiffs and other members of the same discrete group.

405.   Defendants knew or should have known that its affirmative acts specifically endangered Plaintiffs.

406.   Defendants established official policies, customs, and practices, which permitted, condoned, and actually promoted Anderson's access to male athlete victims so that he could both excessively grope and manipulate their genitals, while they sought medical treatment from him.

85

407. The decisions resulting in Defendants' violation of Plaintiffs' constitutional rights under the Michigan Constitution as alleged in this Complaint were made by high level officials of Defendants.

408. Defendants' official policies, customs and practices violated Plaintiffs' rights, and included, among other things, each of the below acts, which each independently violated Plaintiffs' rights:

    a.    Failing to supervise, train and educate Anderson, Anderson's managers or Anderson's patients or their parents (in the case of victims who were minors at the time of the assaults) so that in the absence of this supervision, training and education Anderson's unlawful activities could be carried out;

    b.    Actively concealing Anderson's abhorrent behavior;

    c.    Purposefully placing Anderson in the position as Athletic Department physician, despite knowing he sexually preyed on students under the guise of medical treatment, further enabling Anderson to have unfettered sexual access to more students; and

    d.    Not terminating Anderson.

409. Defendants' policies, customs and practices of permitting, condoning, and reassigning Anderson, which enabled him to gain unfettered sexual access to students, exposed them to unspeakable invasions of their bodily integrity which were

so egregious and outrageous that it shocks the conscience.

## COUNT VIII:
## GROSS NEGLIGENCE

410.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

411.   Defendants owed Plaintiffs a duty to use due care to ensure their safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives, and/or agents, including Anderson.

412.   Anderson owed Plaintiffs a duty of due care in carrying out medical treatment as an employee, agent, and/or representative of Defendants.

413.   By seeking medical treatment from Anderson during his employment, agency, and/or representation of Defendants, a special, confidential, and fiduciary relationship between Plaintiffs and Anderson was created, resulting in Anderson owing Plaintiffs a duty to use due care.

414.   Defendants' failure to adequately supervise Anderson, especially after UM knew or should have known of complaints regarding his nonconsensual sexual touching and sexual penetrations during genital and anal examinations was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs.

415.   Anderson's conduct in sexually assaulting, abusing, and molesting Plaintiffs in the course of his employment, agency, and/or representation of

Defendants and under the guise of rendering medical treatment was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs.

416.   Defendants' conduct demonstrated a willful disregard for precautions to ensure Plaintiffs' safety.

417.   Defendants' conduct as described above, demonstrated a willful disregard for substantial risks to Plaintiffs.

418.   Defendants breached duties owed to Plaintiffs and were grossly negligent when they conducted themselves by the actions described above, said acts having been committed with reckless disregard for Plaintiffs' health, safety, Constitutional and/or statutory rights, and with a substantial lack of concern as to whether an injury would result.

## COUNT IX:
## NEGLIGENCE

419.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

420.   Defendants owed Plaintiffs a duty of care to ensure their safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives and/or agents.

421.   By seeking medical treatment from Anderson in his capacity as an employee, agent, and/or representative of Defendants, a special, confidential, and

fiduciary relationship between Plaintiffs and Anderson was created, resulting in Anderson owing Plaintiffs a duty to use ordinary care.

422.   Anderson owed Plaintiffs a duty of ordinary care.

423.   Defendants' failure to adequately train and supervise Anderson breached the duty of care.

424.   Defendants had notice through its own employees, agents, and/or representatives as early as 1968, and again in 1975 and 1979, of complaints of a sexual nature related to Anderson's predatory and criminal sexual genital and anal examinations of young male students.

425.   Defendants should have known of the foreseeability of Defendants' sexual abuse of male UM athletes, from 1968 onward.

426.   Defendants' failure to properly investigate, address, and remedy complaints regarding Anderson's conduct was a breach of ordinary care.

427.   Anderson's conduct in sexually assaulting, abusing, and molesting Plaintiffs during his employment, agency, and/or representation of Defendants was a breach of the duty to use ordinary care.

## COUNT X:
## VICARIOUS LIABILITY

428.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

429.   Vicarious liability is indirect responsibility imposed by operation of

89

law where an employer is bound to keep its employees within their proper bounds and is responsible if it fails to do so.

430.   Vicarious liability essentially creates agency between the principal and its agent, so that the principal is held to have done what the agent has done.

431.   Defendants employed and/or held Anderson out to be their agent and/or representative from approximately 1966-2003.

432.   Defendants had the right to supervise Anderson's medical exams, indeed had a duty to supervise Anderson.

433.   Defendants had an obvious and direct financial interest in allowing Anderson to continue rendering medical care for the Athletic Department as Defendants financially gain from the operations of its Athletic Department.

434.   Defendants are vicariously liable for the actions of Anderson as described above that were performed during his employment, representation, and/or agency with Defendants and while he had unfettered access to young athletes on UM's campus.

## COUNT XI:
## EXPRESS/IMPLIED AGENCY

435.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

436.   An agent is a person who is authorized by another to act on its behalf.

437.   Defendants intentionally or negligently made representations that

90

Anderson was their employee, agent, and/or representative.

438.  Based on those representations, Plaintiffs reasonably believed that Anderson was acting as an employee, agent, and/or representative of Defendants.

439.  Defendants had the right to control the conduct of Anderson.

440.  Anderson had the right and authority to represent or bind Defendants.

441.  Plaintiffs were injured as a result of Anderson's predatory sexual assault, abuse, and molestation as described above, acts that were performed during the course of his employment, agency, and/or representation with Defendants and while he had unfettered access to young male athletes.

442.  Plaintiffs were injured because they relied on Defendants to provide employees, agents, and or representatives who would exercise reasonable skill and care.

## COUNT XII:
## NEGLIGENT SUPERVISION

443.  Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

444.  Defendants had a duty to provide reasonable supervision of their employee, agent, and/or representative, Anderson, during his employment, agency, or representation with Defendants and while he interacted with young athletes including Plaintiff.

445.  It was reasonably foreseeable that Anderson would continue to sexually

assault and abuse others, given UM's knowledge that Anderson was a sexual predator of primarily young college male students at the time UM first fired Anderson, then reinstated him, and then demoted him in 1980.[3]

446.   Defendants by and through their employees, agents, managers, and/or assigns, knew or reasonably should have known of Anderson's conduct and/or that Anderson was an unfit employee, agent, and/or representative because of his sexual interest in male students.

447.   Defendants breached their duty to provide reasonable supervision of Anderson, and permitted Anderson, who was in a position of trust and authority, to commit the acts against Plaintiffs.

448.   The sexual abuse occurred while Plaintiffs and Anderson were on the premises of UM, and while Anderson was acting in the course of his employment, agency, and/or representation of Defendants.

449.   Defendants tolerated, authorized and/or permitted a custom, policy, practice, or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline such individuals, with the result that Anderson was allowed to violate the rights of persons such as Plaintiffs with impunity.

[3] The firing occurred in 1979 but was intended to be effective in 1980.

## COUNT XIII:
## NEGLIGENT FAILURE TO WARN OR PROTECT

450.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

451.   Defendants knew or should have known that Anderson posed a risk of harm to Plaintiffs or those in Plaintiffs' situation.

452.   As early as 1968, Defendants had direct and/or constructive knowledge as to the dangerous conduct of Anderson and failed to act reasonably and responsibly in response.

453.   Defendants knew or should have known Anderson committed sexual assault, abuse, and molestation and/or was continuing to engage in such conduct.

454.   Defendants had a duty to warn or protect Plaintiffs and others in Plaintiffs' situation against the risk of injury by Anderson.

455.   The duty to disclose this information arose by the special, trusting, confidential, and fiduciary relationship between Anderson as an employee, agent, and or representative of Defendants and Plaintiffs.

456.   Defendants breached said duty by failing to warn Plaintiffs and/or by failing to take reasonable steps to protect Plaintiffs from Anderson.

457.   In addition to affirmatively requiring Plaintiffs to be treated, and thus subject to inappropriate genital manipulations, where UM was aware of Anderson's prior sexual assaults, Defendants breached its duties to protect Plaintiffs by failing

93

to:

a.  Respond to allegations of sexual assault, abuse, and molestation;

b.  Act on evidence of sexual assault, abuse, and molestation; and,

c.  Investigate, adjudicate, and terminate Anderson's employment with UM prior to his treatment of Plaintiffs.

458.  Defendants failed to adequately screen, counsel, and/or discipline Anderson for physical and/or mental conditions that might have rendered him unfit to discharge the duties and responsibilities of a physician at an educational institution, resulting in violations of Plaintiffs' rights.

459.  Defendants willfully refused to notify, give adequate warning, and implement appropriate safeguards to protect Plaintiffs from Anderson's conduct.

## COUNT XIV:
## NEGLIGENT FAILURE TO TRAIN OR EDUCATE

460.  Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

461.  Defendants breached their duty to take reasonable protective measures to protect Plaintiffs and other young adults from the risk of sexual assault by Anderson, such as the failure to properly train or educate Plaintiffs and other individuals (including minors) about how to avoid such a risk.

462.  Defendants failed to, among other things, implement reasonable safeguards to:

94

a.   Prevent acts of sexual assault;

b.   Avoid placing Anderson in positions where he would be in unsupervised contact and interaction with Plaintiffs and other young athletes and patients;

c.   Educate athletes and patients such as Plaintiffs on reporting and/or preventing unwanted touching and penetrations from authority figures, especially given UM's knowledge it was putting a predator such as Anderson in contact with young male athletes; and

d.   Training or educating coaches and trainers to be aware of improper touching, especially given UM's knowledge it was putting a predator such as Anderson in contact with young male athletes.

## COUNT XV:
## NEGLIGENT RETENTION

463.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

464.   Defendants had a duty when credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising employees, agents and/or representatives to exercise due care, but they failed to do so.

465.   Defendants were negligent in the retention of Anderson as an employee, agent, and/or representative in their failure to adequately investigate, report, and address complaints about his conduct of which they knew or should have known.

466.   If Defendants had not retained Anderson, and instead fired him, many Plaintiffs' injuries would not have occurred.

467.   Defendants were negligent in the retention of Anderson as an employee, agent, and/or representative when after they discovered, or reasonably should have discovered, Anderson's conduct which reflected a propensity for sexual misconduct.

468.   Defendants' failure to act in accordance with the standard of care resulted in Anderson gaining access to and sexually abusing and/or sexually assaulting Plaintiffs and an unknown number of other individuals.

469.   The negligence in the credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising of Anderson created a foreseeable risk of harm to Plaintiffs as well as other young adults.

## COUNT XVI:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

470.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

471.   Defendants allowed Anderson to be in a position where he could sexually assault, abuse, and molest minors and young adults. Defendants' actions were extreme and outrageous.

472.   A reasonable person would not expect Defendants to tolerate or permit their employee or agent to carry out sexual assault, abuse, or molestation after they knew of complaints and claims of sexual assault and abuse occurring during

96

Anderson's genital examinations.

473.   Defendants held Anderson in high esteem and acclaim which in turn encouraged Plaintiffs and others to respect and trust Anderson and to not question his methods or motives.

474.   A reasonable person would not expect Defendants to be incapable of supervising Anderson and/or preventing Anderson from committing acts of sexual assault, abuse, and molestation.

475.   Defendants' intentional and/or reckless conduct as described above caused Plaintiff severe emotional distress.

## COUNT XVII:
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

476.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

477.   By allowing Anderson to be in a position where he could sexually assault, abuse, and molest minors and young adults, Defendants were negligent.

478.   Defendants' negligence proximately caused Plaintiffs to be sexually assaulted by Anderson.

479.   Plaintiffs have suffered severe damages related to the sexual assault as well as from discovering they were victims of sexual assault caused by the actions of their beloved alma mater.

480.   Events caused by Defendants, Anderson's sexual assault of Plaintiffs,

naturally and probably resulted in emotional distress.

481.   Events caused by Defendants, Anderson's sexual assault of Plaintiffs, did in fact result in emotional distress.

## COUNT XVIII:
## FRAUD AND MISREPRESENTATION

482.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

483.   From approximately 1966-2003, Defendants represented to Plaintiffs and the public that Anderson was a competent and safe physician.

484.   By representing that Anderson was a team physician and athletic physician at UM, Defendants represented to Plaintiffs and the public that Anderson was safe, trustworthy, of high moral and ethical repute, and that Plaintiffs and the public need not worry about being harmed by Anderson.

485.   The representations were false when they were made as Anderson had and was continuing to sexually assault, abuse, and molest Plaintiffs and an unknown number of other individuals.

486.   Between 1968 and 1979 and perhaps earlier, Defendants received numerous complaints about Anderson's sexual assaults of male patients in the guise of genital and anal examinations, yet misrepresented his moving from UHS to the Athletic Department, as a "resignation" in oral and written representations to UM community and public at large, when they knew Anderson was first fired, then

reinstated with a demotion, as a result of his sexually predatory conduct toward college age males like Plaintiffs.

487.   Although UM was informed of Anderson's conduct they failed to investigate, remedy, or in any way address the patients' complaints.

488.   Defendants continued to hold Anderson out as a competent and safe physician.

489.   Defendants made such misrepresentations intending Plaintiffs and others similarly situated to rely on them.

490.   Plaintiffs relied on the assertions of Defendants and continued to seek treatment from Anderson in the wake of concerns and dangers known only to Defendants.

491.   Plaintiffs were subjected to sexual assault, abuse, and molestation as a result of Defendants' fraudulent misrepresentations regarding Anderson.

## **DAMAGES FOR ALL CAUSES OF ACTION, COUNTS I-XVIII**

492.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

493.   As the direct and proximate result of Defendants' conduct, Plaintiffs suffered and suffer discomfort, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and such other injuries and physical

manifestations as may appear during the course of discovery and trial in this matter.

494. These irreparable harms Plaintiffs suffer, and will continue suffering, are proven damages typically suffered by young men and women when sexually assaulted by someone who is a trusted person and/or medical provider.

495. Symptoms of male sexual abuse on male adults can last for decades and affect their lives in many ways from causing sexual dysfunction and the inability to engage in close relationships with others to confusion about sexual identity, embarrassment and depression. See *Male Victims of Male Sexual Assault: A Review of Psychological Consequences and Treatment* (Sexual and Relationship Therapy, August 2001); *Effects of Sexual Assaults on Men: Physical, Mental and Sexual Consequences* (International Journal of Men's Health, Vol. 6, No. 1, Spring 2007, pp. 22-35).

496. Psychological damage from sexual abuse is especially harmful when the perpetrator is known and trusted by the victim. See *Integration of Sexual Trauma in a Religious Narrative: Transformation, Resolution and Growth among Contemplative Nuns* (Transcult Psychiatry, Feb 2013 – 50 (1): 21-46); *Victim Impact: How Victims are Affected by Sexual Assault and How Law Enforcement Can Respond* (EVAW's OnLine Training Institute, May 2019, p. 34).

497. When sexual abuse is perpetrated by a medical provider, patients often lack the ability to comprehend the abuse due to the provider's position of access,

trust and authority and commonly suffer from emotional distress, humiliation, and the inability to trust medical care providers or the medical care professional generally. See *Above All, Do No Harm: Abuse of Power by Health Care Professionals*, by Kathleen S. Lundgren, Wanda S. Needleman, Janet W. Wohlberg (2004), available at https://www.therapyabuse.org/p2-abuse-of-power.htm.

498.   In whole or in part, as a result of some or all of the above actions and/or inactions of Defendants, Plaintiffs have suffered and continue to suffer irreparable harm as a result of the violations.

**WHEREFORE,** Plaintiffs request that this Court and the finder of fact to enter a Judgment in Plaintiffs' favor against Defendants on all counts and claims above in an amount consistent with the proofs of trial, and seeks an award against Defendants for all appropriate damages arising out of law, equity, and fact for each or all of the above counts where applicable, including but not limited to:

a.   Compensatory damages in an amount to be determined as fair and just under the circumstances, by the trier of fact including, but not limited to medical expenses, loss of earnings, mental anguish, anxiety, humiliation, and embarrassment, violation of Plaintiffs' Constitutional, Federal, and State rights, loss of social pleasure and enjoyment, and other damages to be proved;

b.    Punitive and/or exemplary damages in an amount to be determined as reasonable or just the trier of fact;

c.    Reasonable attorney fees, interest, and costs; and,

d.    Other declaratory, equitable, and/or injunctive relief, including, but not limited to implementation of institutional reform and measures of accountability to ensure the safety and protection of young athletes and other individuals, as appears to be reasonable and just.

Respectfully submitted,

Dated: July 10, 2020                **Grewal Law PLLC**

By /s/ Manvir S. Grewal, Sr.
Manvir S. Grewal Sr. (P48082)
John W. Fraser (P79908)
Daniel V. Barnett (P82372)
Attorneys for Plaintiffs
2290 Science Parkway
Okemos, MI 48864
Ph.: (517) 393-3000
Fax: (517) 393-3003
E: mgrewal@4grewal.com
E: jfraser@4grewal.com
E: dbarnett@4grewal.com

102

## **JURY DEMAND**

Plaintiffs, by and through their attorneys, Grewal Law PLLC, hereby demand

a trial by jury on all claims set forth above.

Respectfully submitted,

Dated: July 10, 2020                **Grewal Law PLLC**

By /s/ Manvir S. Grewal, Sr.
Manvir S. Grewal Sr. (P48082)
John W. Fraser (P79908)
Daniel V. Barnett (P82372)
Attorneys for Plaintiffs
2290 Science Parkway
Okemos, MI 48864
Ph.: (517) 393-3000
Fax: (517) 393-3003
E: mgrewal@4grewal.com
E: jfraser@4grewal.com
E: dbarnett@4grewal.com